AUGUST B. LIENMANN, APPELLANT, V. COUNTY OF SARPY ET AL., APPELLEES.

16 N. W. 2d 725

FILED DECEMBER 15, 1944. No. 31775.

*Kennedy, Holland, DeLacy & Svoboda* and *Edwin Cassem,* for appellant.

*Guy E. Tate* and *Samuel L. Winters, contra.*

Heard before SIMMONS, C. J., PAINE, CARTER, MESS-MORE, YEAGER, CHAPPELL and WENKE, JJ.

SIMMONS, C. J.

In this action, plaintiff seeks to enjoin the sale of his land for taxes on the proposition that the land is not in Sarpy county, Nebraska, but is in the state of Iowa, and that taxes levied by Sarpy county are void for want of jurisdiction over the land. The trial court dismissed the action. Plaintiff appeals. We make findings of fact which require that the decree be reversed and the cause remanded for further proceedings.

The defendants named in the petition are the county of Sarpy, its sheriff, treasurer and commissioners.

Plaintiff in his petition alleges that he is the owner and has been in exclusive possession for more than ten years last past of certain lands, set out by subdivision and tax lot, in Sections 13 and 24, T. 13 N, R. 13 E of the 6th P. M., as described "in the tax records of Sarpy County, Nebraska." He then alleges the land as "described in the United States Government Survey," setting out by subdivision land in Sections 13, 24 and 19, and finally describes the land by a third description, without source of the designations being alleged, but, by subdivisions, as land in Sections 13, 24 and 19. Plaintiff further alleges the official status of the defendants, and alleges that for many years the defendant county never undertook to assert jurisdiction over said lands by taxing the same; that sometime subsequent to the year 1901 the county assessed taxes against the land, and

in 1938 issued and itself purchased tax certificates; that thereafter the county foreclosed the tax certificates and, pursuant to decree, advertised the property for sale; and that the action of the county is wholly void for the reason that the land is outside the boundaries of the county, and in fact is within the boundaries of the state of Iowa.

Plaintiff further alleges that in the United States district court for the district of Nebraska, in an action to try the title to said land (wherein the plaintiff's father and predecessor in title was defendant), a judgment was rendered finding that said land was in Iowa; and that the county of Sarpy knew or was bound to know of the litigation and the status of the land and was estopped to assert jurisdiction.

Plaintiff prayed for a decree holding that the land be held to be outside the boundaries and jurisdiction of Sarpy county; that the taxes be held void; that title be quieted in him free and clear of the taxes; and that the county be enjoined from enforcing the taxes and from asserting or levying present or future taxes.

Defendants, for answer, admitted the official status of defendants, denied generally, and alleged that plaintiff had commenced an action in the district court for Sarpy county, wherein it was alleged, and the decree found, that the plaintiff was the owner of certain lands, described by government subdivision, in Sarpy county.

Trial was had, resulting in a general finding "in favor of the defendant" and dismissing plaintiff's petition.

The only witnesses called were the plaintiff and a civil engineer. They were used as both plaintiff's and defendants' witnesses. The civil engineer's evidence was largely explanatory of exhibits offered by the parties. Basically, there is no disagreement as to the facts. There are some discrepancies in detail in the exhibits, largely centering around descriptive matter with reference to areas with which we are not here concerned. The dispute comes with reference to the conclusion to be reached from the evidence.

This case, as submitted here, involves the sole question of

whether or not the land involved in this action is located in Sarpy county, Nebraska. That question turns on whether or not it is land that has attached to the state of Iowa by accretion resulting from the action of the Missouri river. The two actions referred to in the petition and the answer are argued here only in so far as they tend to establish the fact questions.

· At the outset we were confronted with some preliminary difficulties: First, the allegations of plaintiff's petition in which three different, and irreconcilable, descriptions of the land were alleged. It was stipulated, however, at the beginning of the trial that plaintiff's Exhibit 1 described the land involved. Exhibit 1 is a map prepared by the civil engineer witness. Accordingly, the determination herein made applies to the land as set out in Exhibit 1. Second, the trial court in his decree did not indicate the basis of his decision, and the parties are not in agreement here upon that matter. Accordingly, we are denied the benefit of the reasoning of the trial court. Third, a large number of maps are in evidence. Counsel in some instances in examining witnesses did not refer to the exhibits by number or letter, and the witnesses in answering were not always required to identify exhibits or parts about which they were testifying. Also, some exhibits, reproduced in the bill of exceptions by photostatic copies, do not show markings to which reference is made by the witness. However, the story of this land can be reconstructed almost entirely from the exhibits themselves, and for clarity in discussion, we reproduce here pertinent parts of some of the exhibits, without an attempt being made as to exactness of detail. The exhibits reproduced all find support in other exhibits which are not shown.

In this opinion we will refer to the Nebraska bank of the Missouri river as the right bank and the Iowa bank as the left bank.

## CHART 1

This is the land involved in this action, as shown by Exhibit 1, and is reproduced for the purpose of showing the location of Clarke lake and Papillion creek, and the land claimed with reference to the area of the sections and the land and creek.

## CHART 2

This is a reproduction in outline of plaintiff's Exhibit 2, being a map of a United States government survey made in 1856. It has these points of value: (1) The location of the island with a distinct channel to the west; (2) in 1856 the right bank was at one place west of the east line of Sections 13 and 24, with the intersections of the east line about equidistant from the east and west section line; and (3) the location of Papillion creek. The left bank of the river is not shown with exactness on the exhibit. Defendants assert in their brief: "That the main channel of the river was East of said Island."

388

CHART 3

Chart 3 is a reproduction of defendants' Exhibit G, being a United States government survey made apparently in 1873. This is reproduced for the following reasons: (1) It shows the channel west of the island to be a narrow stream in comparison with the channel east of the island; (2) the island is shown to have been enlarged to the south and east, concededly by accretion; (3) on the exhibit, the main channel is shown to be in the part described as "St. Mary's Bend" with sand bars on the inside of the bend; (4) Pacific Bend, to which reference will be made later, is shown; (5) it also appears that since 1856 the right bank of the river has moved approximately three-quarters of a mile west and into Sections 13 and 24, and that it has been followed by the left bank so that that bank is now well toward the center of the sections. On the exhibit sand bars are shown on the inside of the bend here also. (6) Papillion creek also is shown. It should be here stated that the civil engineer on the witness stand undertook to superimpose Sections 13 and 24 on Exhibit G, and in so doing had practically all of Section 24 south of Papillion creek. The location of plaintiff's land, north of Papillion creek as shown on Chart 1, anchors its location to all these maps

and shows the error admittedly made by the engineer. The exhibit here shows the sections with accurate reference to Papillion creek and the other exhibits.

CHART 4

Chart 4 is taken from plaintiff's Exhibit 3, being the Suter survey of July 14 to July 22, 1879. It is reproduced to show (1) the "Cut off 1879" (shown on defendants' Exhibit B as "Cut off April 1879"), which follows generally the course of the smaller channel to the west of the island as shown on the map of 1873 (Chart 3) and the channel to the west of the island as shown on the map of 1856 (Chart 2). Defendants' Exhibit B, being a more detailed map of this survey, shows the main channel of the river to be flowing through the "Cut off 1879" and not through St. Mary's Bend. (2) These two exhibits show a strip of untimbered land (or point of water) at the southeast part of St. Mary's Bend leading from St. Mary's Bend toward, but not reaching, Pacific Bend. In this connection, there is in evidence a copy of a United States engineer's report, dated January 15, 1878, in which it is stated: "The neck of land between Pacific and Saint Mary's Bends is gradually becoming narrower, and a cut-off is imminent if the cutting continue, as

there is no doubt it will." (3) The exhibits show cottonwood and willow trees growing on this land to the east of a line approximating the east line of Sections 13 and 24, willows growing to the west up to the dotted line and sand bars to the west to the left bank of the river. The exhibits also show that the river near the outer side of the bend in Sections 13 and 24 was 35 feet deep. Plaintiff's witness, who prepared Chart 1, testified that Clarke lake on that exhibit corresponded with the river channel as shown on Chart 4, and that Clarke lake "is today" where the river was at its 35-foot depth in 1879. The exhibits also show large trees growing on the right bank of the river at that bend and the evidence is that there were large elms there when the case was tried. The evidence also is that there is elevated ground which the witness and the exhibits show as the old river bank following generally the right bank of the river as it appears on Chart 4. (4) The location of Papillion creek also is shown.

CHART 5

Chart 5 is taken from defendants' Exhibit F, which was based on a government survey of the river made in October and November, 1881. It shows the main channel of the

river to be again down "St. Mary's Bend" and also shows that the river had cut off the "neck of land" between St. Mary's and Pacific Bends and no longer followed through its old course, as shown on Chart 4. Just when the river made this change is not shown, although the parties seem to agree that it occurred in 1881. The defendant offered in evidence copies of reports of the Army engineers. The date of one is not shown, but there is in it a reference to June, 1881 and to "the extreme high-water of April 25, 1881." In that report it is stated: "Owing to cut-off of 1880 and the development of Saint Mary's Bend, erosion of a temporary nature has been the result this season in Pacific Bend." In a similar report, dated July 1, 1882, it is stated: "In my last report I referred to the change of regimen in the Missouri above this point, its sudden yet desirable transition from Bellevue Chute to its former course in old Saint Mary's Bend." It seems reasonable to conclude that the river first returned to its old course down St. Mary's Bend, and then cut a channel across the neck of land and connected with Pacific Bend. In any event, sometime between July 22, 1879, and the time the 1881 survey was made, upon which Exhibit F (Chart 5) is based, the river returned to its former course in St. Mary's Bend, cut off the "neck of land," ran into Pacific Bend and abandoned its old channel (as shown on Exhibit 3, Chart 4). The evidence is that from that time to this it has continued its channel in that general area. The 1881 map also shows that between July, 1879, and October, 1881, the tip of the land in Sections 13 and 24 had eroded on the northwest side and some islands or bars formed to the west. Also, the exhibit shows a part of Section 13, which is shown as channel of the river in 1879 (Chart 4), to be surface land. Plaintiff's Exhibit 3 and defendants' Exhibit B show sand bars forming in that area in 1879.

The parties have simplified our problem by agreeing that in 1856 the land that lay where the plaintiff's land is now was in Nebraska Territory. They agree also that the plaintiff's land is accretion land. The contentions that the cut-

off of 1879 west of the island and that of 1881 between St. Mary's Bend and Pacific Bend resulted from avulsions are not controverted in the briefs. It is established by the decisions hereinafter cited that they constituted avulsions.

The parties also are in accord on the basic rule of law to be applied here, which is concisely stated in *Nebraska v. Iowa,* 143 U. S. 359, 12 S. Ct. 396: " * * * accretion on an ordinary river would leave the boundary between two States the varying centre of the channel, and that avulsion would establish a fixed boundary, to wit: the centre of the abandoned channel." Or as more recently stated by that court: " * * * when changes take place by the slow and gradual process of accretion the boundary moves with the shifting in the main channel's course. * * * a sudden or avulsive change in that course does not move the boundary, but leaves it where the channel formerly had run." *Kansas v. Missouri,* 321 U. S. 213, 64 S. Ct. 975.

This court has repeatedly followed the rules of law as stated in *Nebraska v. Iowa, supra.* Two years after that case was decided, this court had before it the case of *Bouvier v. Stricklett,* 40 Neb. 792, 59 N. W. 550. The factual situation there was similar to the case at bar. We there quoted at length from and applied the principles of *Nebraska v. Iowa.* Again in *Rober v. Michelsen,* 82 Neb. 48, 116 N. W. 949, this court was presented with a case where the summation of facts could be applied with little change to the facts as they appear in the case at bar, even down to a lake which formed the west and south boundaries. We there cited *Nebraska v. Iowa* and said: "The boundary between Iowa and Nebraska was fixed by the respective acts of Congress admitting said states to the Union as the center of the channel of the Missouri river. That boundary may and does fluctuate with the changes of the channel of that stream where the alteration is gradual and imperceptible; but, when by a sudden variation the stream seeks and marks for itself an entirely new course and abandons the old path, the boundary remains along the line which constituted the center of the old channel." Again, in *O'Connor*

*v. Petty,* 95 Neb. 727, 146 N. W. 947, the factual situation is similar to the case at bar. This case, applying the rules announced in *Nebraska v. Iowa,* held: "The boundary between Iowa and Nebraska follows gradual and imperceptible changes in the main channel of the Missouri river" and "A change by avulsion in the main channel of the Missouri river does not change the boundary line between Iowa and Nebraska." In *First Nat. Bank v. McFerrin,* 142 Neb. 627, 9 N. W. 2d 166, we held: "Lands cut off from the mainland of a state by avulsion do not change their status but remain a part of the state from which they were cut off." Without citing other intervening decisions, *Nebraska v. Iowa* was again followed in the late case of *Conkey v. Knudsen,* 143 Neb. 5, 8 N. W. 2d 538.

We think it appears clearly from this evidence that during the years the water of the river as it moved downward was deflected by the island, so that its force was against the left bank, and decretion took place there with accretion to the island where the slower moving water deposited its burden. By that process, St. Mary's Bend was gradually extended to the south and east. The change in the one bend produced the change in the next and lower bend. The water then moving westward, impinged upon the right bank at Sections 13 and 24, gradually decreting that bank and depositing soil by accretion on the left bank of the river at that bend. By that process the original Nebraska soil was washed away as far west as Clarke's lake, the river occupying the land, and building, by accretion, soil onto the left bank; and by that process, the land here involved became, in part at least, accretion land attached to the left bank of the river. The engineer's reports offered by defendant show that the river in this section has "a heavy slope, averaging 8/10 of a foot to the mile." In the engineer's report of January 28, 1880, it is stated: "When these narrow strips are washed through, cut-offs take place, which shorten the course of the river, change its slope, increase its velocity, and otherwise disturb its regimen for many miles both above and below." When the river cut

across from St. Mary's to Pacific Bend, it shortened its channel, naturally gained additional slope and velocity in so doing, and secured a lower channel. The land formerly under the abandoned channel became surface land, with the exception of the deep area at the bend, which, because of its depth, became and now is Clarke's lake. It is obvious from the maps that the cut-off of 1879 west of the island (later called Bellevue Chute) did not create this land by avulsion. As has been pointed out, the land involved in the east half of Sections 13 and 24 was in July, 1879, well covered with cottonwood and willows. This growth would not have occurred between April, 1879, when the cut-off occurred, and July, 1879, when the survey was made. It necessarily follows that this was accretion land, attached to Iowa before the "cut off of April, 1879" occurred.

But defendants argue that the river did not reach as far west as what is now Clarke lake until sometime in 1881, just before the 1881 cut-off at St. Mary's and Pacific Bends. We do not find supporting evidence of that claim. The evidence of the engineer and the exhibits, we think, clearly establish that the river reached the area now known as Clarke lake in 1879. But, assuming that the cut-off of 1879, being an avulsion, did contribute to the movement of the right bank further west into the Clarke lake area between 1879 and 1881, still it does not deprive the land on the left bank of its status as accretion land. This situation is discussed in *Nebraska v. Iowa, supra,* where the court points out that while the diminution of the bank "may be sudden and obvious" yet the accretion "is always gradual and by the imperceptible deposit of floating particles of earth." So here, we are not concerned with the rapidity of the movement of the right bank westward (although the evidence shows it to have been gradual). We are concerned with the admitted and established accretion to the left bank. Whether the main channel reached and flowed over the land that is now Clarke lake in 1879 or not until "just before" the cut-off of 1881 is not material. The material fact is that the main channel did reach and flow over that land.

This brings us to the necessary conclusion that the land in Sections 13, 24 and 19, that lay to the left of the center of the channel as it existed just prior to and at the time of the cut-off of 1881 (an avulsion), was not in the state of Nebraska.

It follows that plaintiff is entitled to a decree making that finding and to appropriate relief based thereon.

However, we are confronted with a problem in determining just where that center line actually was at that time. Plaintiff has submitted his case upon the proposition that the land which he owns was on the left side of the river in 1879, as shown by the Suter survey (Chart 4). We think the evidence sustains his position as to the land *as of July, 1879*. However, at least a year and a half intervened between the 1879 survey and the cut-off of 1881. There is no evidence showing the exact date of the cut-off of 1881 nor the location of the channel as of that time. The survey of "October and November, 1881" (Chart 5) obviously made sometime after that cut-off occurred, shows that a considerable part of the northwest segment of the land that was on the left side of the river in 1879 had eroded, and that the channel of the stream (then named "Bellevue Chute") was at that place a considerable distance to the southwest of the channel as it existed in 1879. It also shows that land had accreted to the right bank in Section 13 and occupied an area that was river channel in 1879. As has been pointed out, plaintiff's Exhibit 3 and defendants' Exhibit B (the 1879 survey), show sand bars in the northwest quarter of Section 18 (to the east of 13) and extending over into the northeast quarter of Section 13. This area was, following the 1879 cut-off, on the inner curve of the bend at that point. We think it reasonable to conclude that that accretion continued until the cut-off of 1881. Obviously, that accretion was to the right or Nebraska bank. We think it also reasonable to conclude that the major change of the river channel took place prior to and not after the cut-off of 1881, when the volume and velocity of the water in the channel here was much reduced. This conclusion is based upon the

proposition, which finds support in the discussion of the characteristics of the Missouri river found in *Nebraska v. Iowa* and *Kansas v. Missouri, supra,* to-wit: That great erosion does not take place when the water is very high or very low, but at the intermediate stage, when, by undercutting the bank, the top soil falls into the river.

The exact location of the center of the channel at the time of the 1881 cut-off cannot be determined from the evidence before us. The center of the channel at that time determines what part, if any, of the land involved here was in Nebraska at the time the taxes involved herein were levied. We, therefore, reverse the decree of the trial court and remand the cause with directions to have a survey made, based on the 1881 map, and to locate the line by following down the center of the channel of Bellevue Chute, as shown thereon, to the point where it connects with Clarke's lake, then down the center of Clarke's lake longitudinally to the point where it intersects with the center line of Papillion creek extended and then downstream along the center line of the old river channel, and to decree that all land now lying to the left side of that line was not in the state of Nebraska at the time the taxes involved herein were levied, and granting plaintiff appropriate relief based thereon. The trial court's attention is directed to the provisions of the act of May 7, 1943, Vol. 2, page 1394, R. S. 1943.

REVERSED, WITH DIRECTIONS.