GENE DURFEE ET AL., APPELLEES, V. RALPH KEIFFER ET AL., APPELLANTS.

95 N. W. 2d 618

Filed March 27, 1959. No. 34523.

*Pettijohn & Eiser* and *Wiltse & Wiltse,* for appellants.

*Ross & O'Connor* and *Alfred A. Fiedler,* for appellees.

Heard before SIMMONS, C. J., CARTER, YEAGER, CHAP-PELL, WENKE, and BOSLAUGH, JJ.

SIMMONS, C. J.

This is an action to quiet title to land. As originally brought it involved a claim to land lying on both sides of an old chute in the Missouri River. At the area involved the Missouri River runs generally in an east and west direction. The land lying east and north of the chute appears to have been owned by defendant Nellie N. Duke, she having a life estate, with remainder in three children. The land lying south and west of the chute was claimed by the defendant, Julia E. Duke.

Issues were made and trial was had resulting in a decree that plaintiffs were the owners of the land involved lying south and west of the middle of the chute. Defendants appeal. There is no cross-appeal by plaintiffs. Hence the appeal here involves only the lands claimed by defendant Julia E. Duke. We, then, consider it as an appeal in an action brought against defendant Julia E. Duke, hereinafter called defendant, and her tenants.

Plaintiffs alleged in their petition the ownership of the land; that they were owners under and by virtue of a deed executed and delivered as the result of a tax foreclosure proceeding in Richardson County; that the land was situated wholly in the State of Nebraska; that it was west of the meander line of the middle of the channel of the Missouri River as established by a United States government survey in 1855-1856; that the Mis-

souri River by avulsion in 1916 changed its course to its present channel west and south of the land involved; and that the boundary between the states remained as it existed at the time of the 1855-1856 survey.

Defendants answered and alleged that the lands were wholly in the State of Missouri and not within the jurisdiction of the court. They then denied generally, admitted possession, and claimed ownership. They prayed for a dismissal of the plaintiffs' petition.

At the trial defendant testified that she based her claim of title on a swamp land patent from the State of Missouri.

On appeal here defendant argues that she proved ownership by adverse possession. Plaintiffs contend that such a claim must be affirmatively pleaded and cannot now be raised. It does not appear that such a contention was advanced to the trial court. Defendant's testimony negatives it. Claim of ownership by adverse possession is advanced here for the first time.

The rule is: This court will dispose of a case on appeal on the theory on which it was presented to the trial court by the parties. See O'Dell v. Goodsell, 152 Neb. 290, 41 N. W. 2d 123.

This cause is here for trial de novo subject to the rule that: In equity cases when the evidence on material questions of fact is in irreconcilable conflict this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying and must have accepted one version of the facts rather than the opposite. See Rettinger v. Pierpont, 145 Neb. 161, 15 N. W. 2d 393.

Both parties here introduced a large number of aerial photographs, maps, and charts of the area where the land in dispute is located. The record is replete with the testimony of witnesses who referred to locations of land, buildings, fences, dikes, streams, etc., by general statements of "here" and "there," and "indicated" to

the trial court the reference to the location they were testifying about. In many instances we are unable to determine with any degree of certainty to what they refer, and in some instances even the exhibits mentioned cannot be identified. Trial courts should not permit a record to be made of testimony referring to exhibits without requiring counsel and witnesses to identify for the record that about which they testify. Where such a record is made we have no recourse but to apply the above equity rule, and do so here.

It is advisable at this point to state the rules of law that are to be considered here. The parties here are not in disagreement that the boundary between Missouri and Nebraska at the time of the admission of the states to the Union was the center of the channel of the Missouri River. We have held: " 'That boundary may and does fluctuate with the changes of the channel of that stream where the alteration is gradual and imperceptible; but, when by a sudden variation the stream seeks and marks for itself an entirely new course and abandons the old path, the boundary remains along the line which constituted the center of the old channel.' " Lienmann v. County of Sarpy, 145 Neb. 382, 16 N. W. 2d 725.

"Where the main channel of the river changes by accretion and decretion, the boundary between the two states follows the channel. * * * Where the main channel of the river changes by avulsion to a new course, the boundary does not change but becomes fixed along the line which constituted the center of the old channel. * * * Lands cut off from the mainland of a state by avulsion do not change their status but remain a part of the state from which they were cut off." Lienmann v. County of Sarpy, *supra*.

"Land uncovered by a gradual subsidence of water is not an accretion, but a reliction. The same law applies to both these forms of addition to real estate which are held to be the property of the abutting landowner. * * * Accretion is the process of gradual and

imperceptible addition of solid material, called alluvion, thus extending the shore line out by deposits made by contiguous water, or by reliction, the gradual withdrawal of the water from the land by the lowering of the surface level from any cause. * * * Where by the process of accretion and reliction, the water of a river gradually recedes, changing the channel of the stream and leaving the land dry that was theretofore covered by water, such land belongs to the riparian owner. * * * The fact that accretion is due, in whole or in part, to obstructions placed in the river by third parties does not prevent the riparian owner from acquiring title thereto. * * * Where the accretion commences with the shore of the island and afterward extends to the mainland, or any distance short thereof, all the accretion belongs to the owner of the island; but, where accretions to the island and to the mainland eventually meet, the owner of each owns the accretions to the line of contact." Burket v. Krimlofski, 167 Neb. 45, 91 N. W. 2d 57.

"Avulsion is the sudden and rapid change in the course and channel of a boundary river. In Nebraska v. Iowa, 143 U. S. 359, 12 S. Ct. 396, it was said: 'It is equally well settled, that where a stream, which is a boundary, from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; and that the boundary remains as it was, in the center of the old channel, although no water may be flowing therein. This sudden and rapid change of channel is termed, in the law, avulsion.'" Conkey v. Knudsen, 143 Neb. 5, 8 N. W. 2d 538.

We here refer to the banks of the Missouri River as the left bank and as the right bank, as they appear looking down stream.

We find the following factual situation from the record.

During annual flood periods the river ran over a wide area in the location in question. At normal and low

water flow it followed a fairly well defined main channel.

Prior to 1855, the main channel of the Missouri River flowed some distance to the north and east of the location of the land in question. The 1855-1856 survey shows that the main channel of the river had moved west and south, but was still east and north of the land in question. The evidence is ample that thereafter the main channel of the river for many years was along the course of the "old chute" to which witnesses refer and to which the trial court referred in its decree.

About 1887 a railroad bridge was built across the river a short distance above the area in question. The open span was near the right bank of the river. An extended dike led to the bridge on the left side of the river. The construction of the bridge had the effect of shifting the main channel of the river to the west and south. Sand bars and shallow water appeared to the east and north of the new channel and west and south of the former main channel. The land involved here began as an island in that area. It grew by accretion.

At least by 1930, it was sufficiently established to be claimed by a person who quitclaimed it to a Mr. Slagle in 1932. At that time there was a defined channel west and south of the island. However, the evidence of eyewitnesses is that the main channel of the river continued its course along what is now the "old chute."

Mr. Slagle had a cabin on the island, fenced parts of it and kept livestock on it, and had an employee on it at times. He continued in possession of it until 1943, and paid taxes to Richardson County on it until 1944. In 1933 or 1934 the United States government began the work of channel control on the river. In the next few years as a result of that work the main channel of the river was moved to the west and south. As a result of silting in times of flood the island increased by accretion.

In 1943 or 1944, defendant entered upon the island from the old left bank across the old chute, burned grass

and underbrush, built a fence along the chute, and undertook to do some plowing. When the river was in high water stage, water flowed through the old channel where the chute now is located. Recurring annual floods prevented much development until 1954 or 1955 when over 200 acres of land were cleared by defendant and put to crops.

If the river shifted by avulsion from its first position to the main channel as it was and where the chute now is, that shift would avail defendant nothing for the boundary between the states would remain where it was before the avulsion. If, however, that moving of the channel to the west and south was by accretion, it would avail the defendant nothing for the land here involved is not accreted land to the old left bank of the river.

We are here dealing with an island that formed in the river west of the main channel of the river when it ran where the chute now is. That island grew by processes of accretion and finally by reliction. The boundary of the mainland and that of the island meet at the thread of the old chute.

The left bank of the river did not move west and south by accretions to the river bank. Rather, as a result of the works of man and the forces of the water, the river established a new main channel to the west and south of the island.

The question is: Is the island in Missouri or Nebraska?

The effect of the trial court's finding is that it is in Nebraska.

We think it patent that we cannot apply the rule of accretion to the changed course of the stream. Rather it is a situation to which the rule of avulsion applies.

In Whiteside v. Norton, 205 F. 5, 45 L. R. A. N. S. 112, the court was presented with a similar fact situation and held that the cutting of a new channel was analogous to avulsion.

In James v. State, 10 Ga. App. 13, 72 S. E. 600, the

court had a somewhat similar problem to solve. The court held that there was no evidence of a change "by the sudden and violent process of avulsion," yet the act of the United States government in changing the course of a river to improve navigation was analogous to a change caused by avulsion and not by accretion, and that the boundary line was not affected.

In State v. Ecklund, 147 Neb. 508, 23 N. W. 2d 782, we had a quite similar set of facts and decided this precise question by applying the rule of avulsion. We quoted with approval this language from Commissioners v. United States, 270 F. 110: " '* * * where a river changes its main channel, not by excavating, passing over, and then filling the intervening place between its old and its new main channel, but by flowing around this intervening land, which never becomes in the meantime its main channel, and the change from the old to the new main channel is wrought during many years by the gradual or occasional increase from year to year of the proportion of the waters of the river passing over the course which eventually becomes the new main channel, and the decrease from year to year of the proportion of its waters passing through the old main channel until the greater part of its waters flow through the new main channel, the boundary line between the estates remains in the old channel subject to such changes in that channel as are wrought by erosion or accretion while the water in it remains a running stream.' "

The above decision is controlling here. We hold that the land involved in this appeal, lying south and west of the old chute, is within the State of Nebraska; that the trial court had jurisdiction of the cause; and that defendant's swamp land patent from the State of Missouri conveyed no title to her.

This decision is not to be construed as deciding in any way the jurisdictional location of the land east and north of the old chute, as that land is not involved in this action as it comes to us here.

Defendant, assuming that we might find that the land involved is in the State of Nebraska, relies on the rule that: Plaintiff in an action to quiet title has the burden of proof and he must recover upon the strength of his title and not because of any weakness in the title of his adversary. See Stratbucker v. Junge, 153 Neb. 885, 46 N. W. 2d 486. She contends that plaintiffs have not met their burden of proof.

Defendant here contends that the sheriff's deed under which plaintiffs claim title was void.

It is not claimed by defendant that there was any residence on the land where service at the usual place of residence could have been had. It is not claimed that defendant was a resident of Nebraska. In fact the evidence shows that she was a resident of Missouri. It is not claimed that there was anything of record in Richardson County that showed the defendant had or claimed any title or interest in this land.

The foreclosure action named the Slagles as defendants. It named John Doe and Mary Doe and all persons having or claiming to have any interest in any part of the described real estate. As to John Doe and Mary Doe the sheriff's return showed that they were not found in Richardson County.

Defendant's claim rests upon that part of section 25-321, R. R. S. 1943, regarding service upon unknown defendants which provides: "Judgments and decrees against persons so designated and made defendants and served by publication as herein provided shall be conclusive as against all persons who are not in actual possession of such property and whose ownership of, interest in, rights or title to, or lien upon such property does not appear of record in or by their respective names in the county wherein such property is situated."

Defendant contends that she was in "actual possession" and hence entitled to the protection of the act. Defendant makes no charge of irregularities in the proceedings other than the above.

It is to be remembered that when defendant entered upon the land in 1943 or 1944, to the limited extent shown, she entered as a trespasser. After 1946, she claimed under and by virtue of the Missouri land patent. She made no claim to a right of possession otherwise.

The petition of foreclosure was filed August 23, 1955. The sheriff made return of service on August 26, 1955. The decree was rendered on December 15, 1955. The sale was confirmed and the deed to plaintiffs issued and recorded on February 24, 1956.

The question, then, relates to defendant's claim of possession during the above period.

As to that the evidence is extremely meager. The evidence is that there were 220 acres of growing crops on the land in 1955. Defendant testifies that she was in "possession," and received no summons or notice of the foreclosure proceedings. The nearest she comes to defining her possession is to refer to "the land I was supposed to be in the operation of."

A Mr. Keiffer testified that he started farming for defendant on this land in 1954; that "I had about 200 acres" and a good crop growing there in August 1955; and that he was not served with summons. A Mr. Nauman testified that in 1955 he "worked" for Mr. Keiffer. No one undertook to testify as to the nature of the arrangements whereby Keiffer farmed for defendant. In her brief here defendant refers to Keiffer and Nauman as "her tenants." Whether that relates to the time of the tax foreclosure action or the time the instant action was started is not certain.

Neither Keiffer nor Nauman is named as defendant in the tax foreclosure action. They are named as defendants in the instant action brought in November 1956, as parties in possession of a part of the premises. Their answer filed jointly with the Dukes admits possession and alleges ownership in the Dukes. Neither Keiffer nor Nauman is here claiming any invasion of

his rights. The contention here is solely that of the defendant.

We find nothing in the record that even suggests that there was anyone resident on the land or even working on the land when this action began upon whom service of summons could be had. The sheriff's return, which imports verity, negatives any such a conclusion. There is no suggestion that anyone going to the land could have found anyone or anything there that would have suggested where inquiry could be made to determine who, if anyone, claimed any interest in the land. In fact there is no evidence as to where the defendant or her "tenants" were during the period here involved. They make no showing that they were on the land, or in the area of the land, or were either in the State of Missouri or State of Nebraska.

The defendant's position rests solely on the fact that Mr. Keiffer farmed the land for her and that there were over 200 acres of growing crops thereon.

Does that establish "actual possession" within the contemplation of the statute? What did the Legislature intend when it used the term "actual possession"?

In Parsons v. Prudential Real Estate Co., 86 Neb. 271, 125 N. W. 521, 44 L. R. A. N. S. 666, where the tax laws required service of notice upon "every person in actual occupancy of" the lands, an attack was made on a tax deed upon the ground that one Parker was in "actual occupancy" of the premises and that no notice was served on him. Parker was a trespasser and did not live on the land, but cropped the ground. We accepted the following definition: " 'Occupant' * * * 'One who occupies; an inhabitant; especially, one in actual possession, as a tenant, who has actual possession, in distinction from the landlord, who has legal or constructive possession.' " We held that Parker was not an actual occupant of the land.

That decision was filed March 10, 1910. The part of the statute here involved was enacted in 1921. See Laws

1921, c. 226, § 1, p. 815. So we had defined the term before the Legislature adopted it.

The rule is: It is to be presumed that the Legislature in using language in a statute gave to it the significance that had been previously accorded to it by the pronouncements of this court unless a different meaning has been provided by the context of the statute. See Gomez v. State ex rel. Larez, 157 Neb. 738, 61 N. W. 2d 345.

We adhered to the above definition in Quist v. Duda, 159 Neb. 393, 67 N. W. 2d 481.

We construed Parsons v. Prudential Real Estate Co., *supra,* in Kuska v. Kubat, 147 Neb. 139, 22 N. W. 2d 484. The court said: "In that case service of notice to redeem was given to nonresidents only by publication, as in the case at bar. At that time there was a person in actual possession or occupancy of the property but he was a trespasser. No personal service of notice to redeem was had upon him. This court held that none was necessary. In construing the Constitution and applicable statute, it was held that 'occupants' and 'actual possession or occupancy' were synonymous and meant actual, open, visible possession or occupancy in fact, exactly that and nothing less, as distinguished from constructive possession. It was also held that the actual possession or occupancy must be by one claiming an interest in the property either in privity with or adversely to the owner as distinguished from a mere trespasser."

Defendant relies here on Harris v. Heeter, 137 Neb. 905, 291 N. W. 721, 128 A. L. R. 111. There we merely applied the rule of actual possession to the facts. The facts of that case are so dissimilar to the facts here that no comment is required.

It necessarily follows that defendant's attack upon plaintiffs' title by the tax deed has no merit.

We arrive at the same conclusion by another line of reasoning.

It will be noted that section 25-321, R. R. S. 1943, in summary requires an allegation in the petition or other pleading that there are persons who claim to have some interest in the property; that it does not appear of record; that diligent investigation and inquiry have been made; and that the person in whose behalf the investigation has been made does not know the names, whereabouts, or residence of such persons. Section 25-518, R. R. S. 1943, requires an affidavit supporting the allegation. Section 25-517, R. R. S. 1943, requires a court order for service by publication after the court is satisfied that sufficient investigation has been made. It is obvious that such a procedure was intended to establish a "conclusive" record in accord with the facts shown and established to the satisfaction of the court, as against all persons except those "in actual possession" (§ 25-321, R. R. S. 1943), whose interest in the property does not appear of record.

In Draper v. Taylor, 58 Neb. 787, 79 N. W. 709, we stated this rule: Possession of land is notice to the world of the possessor's rights therein.

This holding was followed in Blum v. Voss, 139 Neb. 233, 297 N. W. 84, and Blum v. Poppenhagen, 142 Neb. 5, 5 N. W. 2d 99.

There is a companion rule stated in Talich v. Marvel, 115 Neb. 255, 212 N. W. 540, followed in Marshall v. Rowe, 126 Neb. 817, 254 N. W. 480, and Hollenbeck v. Guardian Nat. Life Ins. Co., 144 Neb. 684, 14 N. W. 2d 330, which is: Where one is put upon inquiry, he is to be charged with notice of all such facts as he would have learned by reasonable inquiry.

It must be assumed that the Legislature had these rules in mind in making the requirements of allegations, proof by affidavit, and court finding and order.

It is obvious that what the Legislature intended was that a party against whom such service by publication had been had could, by proof of actual possession at the time involved, disprove the truth of the showing

upon which the court had permitted the service by publication to be made. The Legislature limited that right to strict compliance with proof of actual possession in the literal meaning of those words. It did not permit the opening up of the conclusive effect of the service by publication except upon a showing of that condition in fact. The showing here is patently insufficient to meet this test.

Defendant advances a further contention based upon the following from Maryland v. West Virginia, 217 U. S. 1, 30 S. Ct. 268, 54 L. Ed. 645: "Where possession of territory has been undisturbed for many years a prescriptive right arises which is equally binding under the principles of justice on States and individuals."

There again the facts are so dissimilar that we see no reason for discussing the case here.

The judgment of the trial court is affirmed.

AFFIRMED.

MESSMORE, J., participating on briefs.