**Julia E. DUKE, Plaintiff,**

v.

**Gene DURFEE and Laura Durfee, husband and wife, et al., Defendants.**

**No. 1027.**

United States District Court
W. D. Missouri,
St. Joseph Division.

Jan. 23, 1961.

Robert A. Brown, of Brown, Douglas & Brown, St. Joseph, Mo., Wiltse & Wiltse, Falls City, Neb., and Pettijohn & Eiser, Oregon, Mo., for plaintiff.

Kranitz & Kranitz, St. Joseph, Mo., August Ross, and Alfred A. Fiedler, Omaha Neb., for defendants Durfee.

John M. Dalton, Atty. Gen., by John W. Inglish, Asst. Atty. Gen., Jefferson City, Mo., amici curiæ.

DUNCAN, District Judge.

Plaintiff, a resident of Missouri, instituted this suit against the defendants in the Circuit Court of Holt County, Missouri, on May 23, 1959, alleging that she is the owner in fee simple and in possession of the real estate described in the "Petition". (The land described by metes and bounds is quite long and consists of several hundred acres of an island in the Missouri River Bottoms, and in view of the court's determination of the case, I see no reason to set out the description here.)

The case was removed to this court by the defendants, Gene and Laura Durfee, residents of the State of Nebraska. This court has jurisdiction by virtue of non-residency of said defendants and the amount in controversy, which exceeds the sum of $10,000.00.

Plaintiff alleged that the defendants Durfee claim some right, title or interest in and to said real estate, and that the defendants Ralph Keiffer and Russell Nauman are in possession of the property as tenants of the plaintiff; that the defendant, First State Bank of Forest City, Missouri, is the beneficiary, and defendant James H. Pettijohn is the trustee of a deed of trust, and that such parties have no interest in the litigation other than that set out herein.

Plaintiff asks the court to decree that the fee simple title is in her and that the defendants be forever enjoined and restrained from asserting or claiming

any right, title or interest in or to any of said property.

Plaintiff claims ownership by virtue of a Swamp Land Patent issued to her by the State of Missouri (Holt County) under the provisions of § 241.220 RSMo 1949, V.A.M.S., in 1946.

The evidence reveals that the defendants Durfee obtained a sheriff's deed to the property as the result of a tax foreclosure sale by Richardson County, Nebraska. Plaintiff also claims title by adverse possession, which will be discussed hereafter.

The main channel of the Missouri River was established as the boundary between Missouri and Nebraska at the time Nebraska was admitted to the Union.

It is the defendants' contention that the land in controversy is on the Nebraska side of the main channel of the Missouri River, and thus the property of the State of Nebraska.

In 1956, the defendants Durfee brought an action in the District Court of Richardson County, Nebraska, against Julia E. Duke and her tenants, to quiet title, alleging that they were the owners by virtue of the sheriff's deed, as heretofore mentioned.

The defendants in that case raised the issue of the sufficiency of the service upon them, which was overruled by that court, and they then submitted themselves to the jurisdiction of the court and joined in the trial of the issue as to whether the land in controversy was in the State of Missouri or in the State of Nebraska.

After hearing all of the evidence, the District Court made a general finding that the land was in Nebraska; that the plaintiffs were the owners thereof, and that the defendants had no right, title or interest thereto. On appeal by the defendants to the Nebraska Supreme Court, the action of the District Court was affirmed in an opinion in Durfee v. Keiffer, 168 Neb. 272, 95 N.W.2d 618.

Because the District Court had not made any Findings of Fact or Conclu-

sions of Law, the Supreme Court tried the case de novo, made its Findings of Fact and Conclusions of Law, and also arrived at the determination that the land was in the State of Nebraska.

That court fully discussed the evidence, the maps and other exhibits as a basis for its finding. There was no appeal by the defendants from the decision of the Nebraska Supreme Court to the Supreme Court of the United States. Instead the defendant there, Julia Duke, instituted this suit in the State of Missouri.

Here, the defendants raise the question of the jurisdiction of this court to hear and determine the issues, as they were determined by the Nebraska Court, and contend that the decision in the Nebraska Court is final and is entitled to full faith and credit and is res judicata.

I concur in the finding of the Nebraska court that prior to 1855, the main channel of the Missouri River flowed to the north and east of the location of the land in question here. The survey of 1855–56 shows that the main channel of the River had moved west and south of its location prior to that time, but was still east and north of the land in question.

In 1877 a railroad bridge was built across the river above the land that is now in question. The open span of the bridge was near the right bank or the Nebraska side of the river. An extended dike was constructed on the left side or the Missouri side of the river, leading to the bridge.

It is contended, and I think it is true, that this work had the effect of shifting the main channel of the river to the west and south. It is probable that it was in this area that islands began to form and grow by accretion, and it was the islands and the land thus created that plaintiff testifies she remembers in the early '20s. At least by 1930, they had grown sufficiently that one Slagle in 1932 laid claim to them by virtue of a quit claim deed.

The Nebraska court found that at that time there was a defined channel west

and south of the island. That court however, found that the main channel of the river continued its course along what is now the old chute.

Slagle built a cabin on the island, fenced part of it and apparently ran some livestock on it, and continued in possession until about 1943, and paid taxes to Richardson County, Nebraska. It was shortly after Slagle obtained possession of it (probably 1933–34) that the Government began its channel control work. Thereafter, as a result of this work, the channel of the river was moved to the west and south.

Apparently it was upon these facts that the Nebraska court determined that the change in the course of the river resulted from avulsion rather than from attrition or accretion.

In arriving at its conclusion, the Supreme Court of Nebraska in syllabus 7 which was written by the court, l. c. 620 of its opinion, said:

"The fact that accretion is due, in whole or in part, to obstructions placed in the river by third parties does not prevent the riparian owner from acquiring title thereto."

At page 624 of its opinion, that court stated:

"We are here dealing with an island that formed in the river west of the main channel of the river when it ran where the chute now is. That island grew by processes of accretion and finally by reliction. The boundary of the mainland and that of the island meet at the thread of the old chute."

Considering the court's own statement, I think it must be assumed that prior to the cutting of what is referred to as the "new chute and channel" the main channel of the river was to the west of the island formation.

I am unable to find any evidence in the case that is convincing to me that the chute was the result of the gradual change of the course of the river. To me, the most convincing evidence is that the chute which was formed in the early '20s, was the result of avulsion occasioned by the accumulation of ice which suddenly cut a new channel, but I do not believe the evidence shows that this new chute or channel became the main channel of the river.

Following the course of the river from 1846 to the period prior to the cutting of the channel, I find no evidence of the formation of a new channel by avulsion, unless it was the chute referred to above. If the channel was the result of avulsion, as it is my conclusion it was, and if the main channel prior thereto was west of the formation of the island, then, of course, the property lines did not change nor did the boundary between Nebraska and Missouri change.

The question of ownership by adverse possession was not raised by the defendants in the Nebraska District Court, but was raised in the Supreme Court. That court held that it was bound to determine the case upon the same issues that were presented to the District Court, and, therefore, refused to consider the question of adverse possession.

In arriving at its conclusion, the Supreme Court of Nebraska found:

"Prior to 1855, the main channel of the Missouri River flowed some distance to the north and east of the location of the land in question. The 1855–1856 survey shows that the main channel of the river had moved west and south, but was still east and north of the land in question. The evidence is ample that thereafter the main channel of the river for many years was along the course of the 'old chute' to which witnesses refer and to which the trial court referred in its decree.

"About 1887 a railroad bridge was built across the river a short distance above the area in question. The open span was near the right bank of the river. An extended dike led to the bridge on the left side of the river. The construction of the bridge had the effect of shifting the main channel of the river to the west

and south. Sand bars and shallow water appeared to the east and north of the new channel and west and south of the former main channel. The land involved here began as an island in that area. It grew by accretion.

"At least by 1930, it was sufficiently established to be claimed by a person who quitclaimed it to a Mr. Slagle in 1932. At that time there was a defined channel west and south of the island. However, the evidence of eyewitnesses is that the main channel of the river continued its course along what is now the 'old chute.'

"Mr. Slagle had a cabin on the island, fenced parts of it and kept livestock on it, and had an employee on it at times. He continued in possession of it until 1943, and paid taxes to Richardson County, on it until 1944. In 1933 or 1934 the United States government began the work of channel control on the river. In the next few years as a result of that work the main channel of the river was moved to the west and south. As a result of silting in times of flood the island increased by accretion.

"In 1943 or 1944, defendant entered upon the island from the old left bank across the old chute, burned grass and underbrush, built a fence along the chute, and undertook to do some plowing. When the river was in high water stage, water flowed through the old channel where the chute now is located. Recurring annual floods prevented much development until 1954 or 1955 when over 200 acres of land were cleared by defendant and put to crops.

"If the river shifted by avulsion from its first position to the main channel as it was and where the chute now is, that shift would avail defendant nothing for the boundary between the states would remain where it was before the avulsion.

If, however, that moving of the channel to the west and south was by accretion, it would avail the defendant nothing for the land here involved is not accreted land to the old left bank of the river.

"We are here dealing with an island that formed in the river west of the main channel of the river when it ran where the chute now is. That island grew by processes of accretion and finally by reliction. The boundary of the mainland and that of the island meet at the thread of the old chute.

"The left bank of the river did not move west and south by accretions to the river bank. Rather, as a result of the works of man and the forces of the water, the river established a new main channel to the west and south of the island.

"The question is: Is the island in Missouri or Nebraska?

"The effect of the trial court's finding is that it is in Nebraska.

"We think it patent that we cannot apply the rule of accretion to the changed course of the stream. Rather it is a situation to which the rule of avulsion applies."

The question of res judicata was timely raised by the defendants by Motions to Dismiss in this court, and were by this court overruled before the case came on for trial.

It is plaintiff's contention that the question of jurisdiction may be raised at any time, and that the factual situation as to whether or not the land is actually in Nebraska or Missouri would determine the question of the jurisdiction of this court regardless of any Findings of Fact or Conclusions of Law reached by the Nebraska courts in the former trial.

At the time the Motion to Dismiss was determined by the court, it was felt that the whole matter should be presented to the court so that it could make such decision as it felt necessary to a full and complete determination both of the ques-

tion of jurisdiction and the question of fact.

The decisions of the state and national courts involving the title to lands along the Missouri River and islands therein, are so numerous that they fill many volumes. Such questions are always troublesome to the courts, although the principles of law involved are well settled.

Before it was subdued, the Missouri River was the greatest outlaw the West has ever known. It was as nomadic as the tribes that lived along its banks and gave it its name. It was no respecter of persons or property. It often took from those who had and gave to those who had not; it often took from the poor and gave to the well-to-do.

When we attempt to determine where the channel was from year to year prior to the period when the channel stabilization program began, we must rely upon the memory of man to a very large degree, and, of course, the memory of man is often faulty and fades with time, and no two pairs of eyes see the same thing in the same way, although they may be equally honest in their attempt to describe that which actually exists.

 Islands are formed in the Missouri River during one high water period and taken away in another. They are moved from one place to another, sometimes slowly, sometimes over night. Land and islands may be created by accretion, by avulsion or by attrition. There is no dispute about the legal principle that when the river suddenly changes its channel or its course, the property lines existing prior thereto are not affected, and that includes the boundaries between these states. If the main channel of the river changes by attrition or as the result of erosion, the boundary follows the course of the river.

It was not until the Corps of Engineers of the United States Army began the work of controlling the channel of the Missouri River for navigation purposes and later for flood control purposes, that its course had any stability. Since that time it has reasonably been confined within the areas charted by the engineers.

The history of the land in question goes back to as early as 1916, when the father of the plaintiff first acquired the land of which the land in question is now a part Plaintiff testified that her father had acquired a part of the land in 1916 by purchase; that she remembered in the early '20s that there was land south and west of her father's land; that as a child she remembered having walked out on that land.

A portion of a cottonwood tree was introduced in evidence at the time of this case, which the plaintiff testifies was cut on the land in controversy in 1959. The state forester of Missouri testified that the tree was at least 35 years old, which indicated that the land, at least some portion of it, had existed with sufficient permanency to support the growth of shrubbery and trees for that many years. Plaintiff further testifies that her father from time to time had livestock on a portion of the land in controversy.

Plaintiff remembers when the chute was formed in the mid-'20s. She says the river cut-through was caused by an ice gorge. She remembers her father's attempt to stabilize the bank of the river at the place where the chute cut through. She further testifies that as a result of the cutting through, approximately 100 acres of her father's land was cut away, because thereafter that amount was removed from the tax rolls in Holt County, Missouri.

To me, the evidence clearly reveals that prior to the cut-through and the formation of the chute, the main channel was to the south and west of the land in controversy.

Some time in the early '30s the Government began its work of stabilizing the Missouri River by placing revetments and whatever other types of engineering devices the particular nature and character of the work required. These dikes started on the Missouri side of the

river and extended through the plaintiff's land, and plaintiff says to the main channel of the river. Thereafter there was a gradual closing of the chute.

In 1943, the plaintiff began to use a portion of the land; she caused a portion of it to be burned off and a portion of it was cultivated, but it was not until 1946 that she acquired the deed which has heretofore been described. In 1946, she bought a bulldozer and started building a crossing across the chute. From year to year thereafter plaintiff continued to put forth such effort as the season would permit, to bring additional portions of the land under cultivation.

Naturally, the extent of the high water would determine the extent she was able to carry on these activities. The nature of the season and the extent of the high water would also determine the rapidity with which the chute was filled up. Whether or not this chute was ever the main channel of the river, is, of course, the principle question in this controversy.

Assuming that prior to the cutting of the chute the main channel and the boundary line between the states were to the south and west of the land in controversy, the sudden cutting of the chute, even if it created a new main channel, would not have changed the line, because it was by avulsion and did not affect property lines.

It is a matter of common knowledge among those who have lived along the river, that islands rise from season to season, and may shift from season to season, depending upon the amount of high water, and, as one of the expert witnesses expressed it, the result of numerous "flows" or "currents" which may not constitute the main channel of the river.

The evidence revealed that there are many currents and cross-currents in the Missouri River, but not necessarily are such currents or cross-currents the main channel of the river. They do, however, materially affect the development and the building of islands and the cutting of minor chutes through an island. At one season of the year there may be a chute through an island, and at another season and after a period of high water the chute may have completely disappeared. As the island increases in size and height and vegetation begins to grow upon it, it gathers more sediment, mud and silt, thus becoming more secure and develops with much greater rapidity.

Certainly if the area which constituted the chute was the main channel and was caused to fill up gradually because of the building of the revetments by the Army Engineers, it did not suddenly change its course. Whether or not the river changes its channel gradually or suddenly as the result of the engineering efforts of man, does not affect property rights or the line between the states. If the channel of the river was caused to move slowly because of the revetments, the property lines would follow it. If it was caused to move suddenly, they would not follow it.

I have carefully reviewed the evidence that was introduced in the Nebraska court and in this court, including the two experts who have had much experience in construction work on the Missouri River, and I am convinced that the evidence clearly shows that prior to the formation of the island in controversy, the main channel of the river was to the south and west thereof.

With due respect to the learned gentlemen on the Nebraska courts for whom I have the most profound respect, I am unable to agree with them that the chute became the main channel. But, if it did become the main channel, it was by avulsion and did not affect the boundary line.

There is no contention in this case that the land formerly acquired by the plaintiff's father and now belonging to her mother, is on the Nebraska side of the river, and if that is true, it is difficult for me to understand how, under all the evidence, that the land in controversy is, or was at the time the issue was determined by that court, in Nebraska.

During a long period of time both states apparently exercised jurisdiction over the land; the prosecuting attorneys of both states exercised jurisdiction over it; the alleged Nebraska owners did not exercise any supervision or occupancy of the land from the late '30s or early '40s until this suit was brought in 1959, and plaintiff was in unquestioned, undisputed possession of the land from 1943 until the present time.

It is my definite conclusion that under all the evidence in this case, the land was located in Missouri at the time plaintiff acquired her deed under the Swamp Land Title Act. Notwithstanding my conclusion that the land is located in Missouri, I am convinced that under the law this court has no jurisdiction to determine that question, and it is with much reluctance that I must conclude that the Nebraska decision is res judicata and determinative of the whole question of location and ownership.

If the defendant had not litigated the subject of the location of the land and her right to the possession and ownership thereof in the Nebraska court, I think there would have been no question about the right of this court to hear and determine that issue, but that is not the fact. The parties submitted themselves as well as their cause to that court. The question has been before the courts both state and national many times and involving many types of situations both as to individuals and property.

There is a very significant statement in the Commentaries by Mr. Justice Story quoted in Grover & Baker Sewing Machine Co. v. Radcliffe, 137 U.S. 287 l. c. 296, 11 S.Ct. 92, 34 L.Ed. 670, that:

" * * * "no sovereignty can extend its process beyond its own territorial limits, to subject other persons or property to its judicial decisions. Every exertion of authority beyond these limits is a mere nullity, and incapable of binding such persons or property in other tribunals;" ' * * * 'Such is the familiar, reasonable and just principle of the law of nations; and it is scarce supposable that the framers of the Constitution designed to abrogate it between States which were to remain as independent of each other, for all but national purposes, as they were before the revolution.' "

Reading this quotation from the Commentaries of a great jurist in an abstract manner might lead one to say that the principle there expressed is applicable here and would confer power upon this court to again hear and determine the question for itself. But, when we read it in connection with the many decisions on the subject, it takes on a different meaning. For example, it was said in Baldwin v. Iowa State Traveling Men's Assoc., 283 U.S. 522 at 525, 526, 51 S.Ct. 517, 75 L.Ed. 1244:

" * * * The special appearance gives point to the fact that the respondent entered the Missouri court for the very purpose of litigating the question of jurisdiction over its person. It had the election not to appear at all. If, in the absence of appearance, the court had proceeded to judgment and the present suit had been brought thereon, respondent could have raised and tried out the issue in the present action, because it would never have had its day in court with respect to jurisdiction. (Citations omitted). It had also the right to appeal from the decision of the Missouri District Court, * *. It elected to follow neither of those courses, but, after having been defeated upon full hearing in its contention as to jurisdiction, it took no further steps, and the judgment in question resulted.

"Public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties. We see no reason why this doctrine should not apply in every case where one voluntarily appears, presents his case and is fully heard, and why he should not,

in the absence of fraud, be thereafter concluded by the judgment of the tribunal to which he has submitted his cause."

I am not unmindful of the language of the court in Treinies v. Sunshine Mining Co., 308 U.S. 66, 60 S.Ct. 44, 84 L.Ed. 85, in which the question of jurisdiction was extensively discussed, but I think a careful reading of that opinion clearly indicates that the question of jurisdiction was not determined in the Washington court, and that if it had been so determined, it would have been *res judicata* because the court says:

"One trial of an issue is enough. 'The principles of *res judicata* apply to questions of jurisdiction as well as to other issues,' as well to jurisdiction of the subject matter as of the parties."

All of the issues that are now before this court, except that of ownership by adverse possession, were tried by the Nebraska court, with all of the parties present contesting those issues, and while the question of jurisdiction of a *res* may be re-litigated by a second court, [Thompson v. Whitman, 18 Wall. 457, 21 L.Ed. 897] yet this right is limited in its application to cases where the jurisdictional point was not litigated in the first suit. Adam v. Saenger, 303 U.S. 59, 62, 58 S.Ct. 454, 82 L.Ed. 649; Berkman v. Ann Lewis Shops, 2 Cir., 246 F. 2d 44, 47.

Although it is my belief that the evidence clearly reveals that the land lies in Missouri, yet a trial of that very issue with all of the parties present in the Nebraska court is now binding upon this court, and precludes it from again decreeing the ownership of the land, and that the finding and judgment must be against the plaintiff on that account only.

The defendants have filed a counterclaim asking for an accounting of the profits derived by the plaintiff as a result of use of the land. Having determined that this court is without jurisdiction to determine the question of the ownership of the property, I think this court is without jurisdiction to determine this question. However, if I were to determine the issue, I would say most definitely that the amount of money which has been expended by the plaintiff in bringing the land to a state of cultivation far exceeds the amount of profit she has derived therefrom, and that she would not be liable to the defendants for any sum.