Re: U. S.

v.

WILSON;

OMAHA INDIAN TRIBE

v.

JACKSON;

OMAHA INDIAN TRIBE

v.

AGRICULTURAL & INDUSTRIAL INVESTMENT CO.

Nos. C75–4024, C75–4026 and C75–4067.

United States District Court,
N. D. Iowa, W. D.

Sept. 4, 1981.

James J. Clear, Dept. of Justice, Land & Natural Resources Division, Washington, D. C., Robert Sikma, U. S. Atty., Sioux City, Iowa, for United States of America.

William H. Veeder, Washington, D. C., John T. O'Brien, Sioux City, Iowa, for Omaha Indian Tribe.

Edson Smith, Donald Buresh, Robert J. Becker, Omaha, Neb., for Roy Tibbals Wilson.

Lyman Larsen, Thomas Burke, Omaha, Neb., for Charles G. and Florence Lakin and Harold Jackson.

John E. North, Lee Hamann, Omaha, Neb., for Charles and Florence Lakin.

Peter J. Peters, Council Bluffs, Iowa, for RGP, Inc. and Otis Peterson.

Maurice Nieland, Sioux City, Iowa, for The Travelers Ins. Co., Harold Sorenson and Harold M. Luea Sorenson and Darrell L. Sorenson.

Elizabeth M. Osenbaugh, Thomas J. Miller, John P. Sarcone, Asst. Attys. Gen., Des Moines, Iowa, for State of Iowa and Iowa State Conservation Commission.

Monona County Atty., Michael Jensen, Onawa, Iowa, for Monona County.

D. Carlton Shull, George Madsen, Sioux City, Iowa, for Agricultural & Indus. Inv. Co.

Wiley Mayne, Lowell C. Kindig and John Mayne, Sioux City, Iowa, for numerous defendants.

Phillip J. Willson, Council Bluffs, Iowa, for Northern Natural Gas Co.

Ronald E. Runge, Sioux City, Iowa, for Lloyd Fletcher.

Dewie J. Gaul, P. L. Nymann, Sioux City, Iowa, for Iowa Public Service Co.

Robert R. Eidsmoe, Sioux City, Iowa, for Mobil Pipeline.

Theodore T. Duffield, Des Moines, Iowa, for Regina Marie Torticilli.

Steven Carter, Sioux City, Iowa, for James McGuire, Auctioneer for Hudgel Estate.

Emmanuel S. Bikakis, Sioux City, Iowa, for Williams Pipeline Co. (formerly Williams Bros. Pipeline).

Clark G. Redick, Kansas City, Mo., for American Tel. & Tel. Co.

Larry Fulton, Denver, Colo., for the Fidelity National Title Ins. Co.

Ernest L. Olson, pro se.

## MEMORANDUM OPINION

BOGUE, Chief Judge.

The Eighth Circuit Court of Appeals remanded these cases to this Court to determine the facts in light of the principles and conclusions set forth in both its second opinion, *Omaha Indian Tribe v. Wilson*, 614 F.2d 1153 (8th Cir. 1980), and in the opinion of the United States Supreme Court. *Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979). This Memorandum Opinion provides this Court's resolution of several issues of law and fact remaining in the consolidated Blackbird Bend-Barrett Survey area cases.

## I. FACTUAL BACKGROUND

These cases concern the ownership of approximately 2,900 acres of land on the east bank of the Missouri River in Iowa. The parties seek to quiet title to the land, which was affected by the movement of the banks of the Missouri River over a period of nearly eighty years. The history of this land dispute and the discussion of the early movement of the Missouri River is set out in the Court's original opinion, 433 F.Supp. 67 (N.D.Iowa 1977), as well as the two opinions of the Court of Appeals. 575 F.2d 620 (8th Cir. 1978); 614 F.2d 1153. The Court of Appeals vacated this Court's original judgment and remanded the case with several directions. First, the Court entered judgment quieting title to the trust lands involved in this action, except those claimed by the State of Iowa, in the United States as trustee and the Omaha Indian Tribe. Second, the Appellate Court ordered that the Tribe's case against the State be severed, so that this Court could separately determine whether the Tribe sustained its

burden of proof against the State. 614 F.2d at 1161.

Several additional issues were not resolved by any of the Appellate Court decisions in this case. One issue concerns the ownership of land within the Barrett Survey which was allotted to individual Indians and subsequently patented to non-Indians, or relinquished by the Indian allottees back to the Tribe. The Court of Appeals' second decision concerned only trust lands and failed to respond to issues of ownership of "fee patented" lands. The Court's first decision remanded the issues of fee patented land ownership back to this Court. 575 F.2d at 651, n. 70. This Court must further address the defendants' claim for the value of improvements placed upon land in which title was quieted in plaintiffs. Finally, this Court has before it the parties' motions for summary judgment concerning title to lands outside the Barrett Survey within the Blackbird Bend area.

To better understand the remaining issues and claims of the parties, the Court refers to Exhibit T80. (Plate 1) The large dotted area represents land which has never been allotted to any member of the Omaha Tribe and has never been patented by the United States to anyone. These are trust lands claimed only by individual defendants and clearly are governed by the Court of Appeals' order to this Court to quiet title in the United States as trustee and in the Tribe. The small dotted areas on Exhibit T80 represents allotments which have been relinquished by the allottees or cancelled. See also, Exhibits A through P.[1] Finally, the cross-hatched areas on Exhibit T80 are lands which have been patented in fee or otherwise left their trust status after the 1854 Treaty. The individual defendants assert a claim to the fee patented lands based

upon state laws for adverse possession, statutes of limitation and laches.

The Tribe contends that both the individual defendants' claim to fee patented lands and the State of Iowa's claim to land along the western edge of the Barrett Survey, are defeated by the evidence establishing that all of the land in the western Barrett Survey was eroded and replaced by accretions to tribal trust land. The prior decisions in this case place upon the Tribe the burden of proving its case against the State by a clear preponderance of the evidence. 99 S.Ct. at 2543; 614 F.2d at 1161. This Court must address first the State's argument concerning the scope of the Tribe's burden of proof.

## II. THE TRIBE'S BURDEN OF PROOF AGAINST THE STATE OF IOWA

The Tribe asserted title to trust lands in the eastern portion of the Barrett meander lobe based on a series of river avulsions between 1867 and 1923, which left these original reservation lands in place. 433 F.Supp. at 70–71. After reaching its 1923 position,[2] however, the Tribe asserted the River moved easterly, eroding the western portion of the Barrett Survey up to a line running north to south through the western edge of Nebraska Sections 13 and 24.[3] From this line eastward in the Barrett Survey, the Tribe alleged its lands left in place by pre-1923 river avulsions were not later obliterated. From this line, to the west in the Barrett Survey up to the 1943 Iowa-Nebraska Compact line, the following specific River movements were asserted: (1) From 1923 to 1930, the River eroded all of the Barrett Survey lands lying west of the "not obliterated" line, as the River moved eastward; (2) From 1930 to 1943, the River receded westward to its present location, replacing all of the western Barrett Survey lands with accretions and relictions. These

---

1. Exhibits A through P are the letters of various allottees or their heirs requesting that their original allotments within the Omaha Indian Reservation be exchanged for new allotments. Because of the encroachment of the Missouri River, the original allotments had become unsuitable for farming. (Corke–86:12–88:12).

2. Exhibit T105, (Plate 2)

3. See, Exhibit T80; (Abrahamson—1425:7–19)

accretions attached to tribal lands in place in the Barrett Survey east of the "not obliterated" line. *See*, Tribe's Post-Trial Proposed Findings of Fact, No. 58; (1446:9–1447:24).

The Tribe owns the trust lands east of the "not obliterated" line by virtue of the Court of Appeals' decision which held that the individual defendants failed to prove their superior title thereto based on pre-1923 river movements. 575 F.2d at 650, 651; 614 F.2d at 1161. The land claimed by the State of Iowa is located along the Compact line in the western portion of the Barrett Survey. *See*, State's Proposed Findings on Remand, No. 41. Consistent with its original theory, therefore, the Tribe asserts title to these lands as accretions created after 1923, which attached to eastern tribal lands.

The State of Iowa, however, contends that the Tribe must affirmatively prove pre-1923 river avulsions as well as movement by accretion thereafter.[4] The State asserts it is not bound by the Court of Appeals' decision quieting tribal title to the eastern Barrett Survey lands, since that decision was based upon the failure of other defendants to meet their burden of proof under 25 U.S.C. § 194. That decision "does not establish, in this proceeding in which the [Tribe has] the burden of persuasion, that the river moved to its 1879 and 1923 positions by avulsion. . . ." State's Proposed Conclusions on Remand, No. 10. Given the reallocation of the burden of proof on remand, the State contends there is a "nonidentity of issues." In support of its conclusion that the Tribe must prove pre-1923 avulsions over eastern Barrett Survey lands, the State cites *Young & Co. v. Shea*, 397 F.2d 185, 188–189 (5th Cir. 1968); *In re Four Seasons Securities Laws Litigation*, 370 F.Supp. 219, 235 (W.D.Okl.1974); *Fin-*

nerman v. McCormick, 499 F.2d 212, 214 (10th Cir. 1974); *Shimman v. Frank*, 625 F.2d 80, 89 (6th Cir. 1980). These cases stand for the rule that a judgment obtained in a prior, distinct proceeding will not resolve common issues of fact in a subsequent case between the same parties, in which the burden of persuasion differs. *See also*, Rest.2d *Judgments*, § 68.1(d).

■ Admittedly, this is not a proper case for the invocation of the doctrines of *res judicata* and collateral estoppel. *Res judicata* requires a showing that there has been a previous action between the same parties involving the same subject matter, in which a final judgment has been rendered with respect to the same cause of action. *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Bryson v. Guarantee Reserve Life Ins. Co.*, 520 F.2d 563 (8th Cir. 1975). Clearly, the Tribe does not invoke a judgment obtained in a prior, distinct proceeding. The judgment quieting tribal title in eastern Barrett Survey trust lands was entered on appeal in this action, and it concerned the title to property distinct from the land the State claims.

■ Further, collateral estoppel means that when an issue of ultimate fact has once been determined by a valid and final judgment, the issue cannot again be litigated between the same parties in a future lawsuit. *Harris v. Washington*, 404 U.S. 55, 92 S.Ct. 183, 30 L.Ed.2d 212 (1971); *Oldham v. Pritchett*, 599 F.2d 274 (8th Cir. 1979). The issue of ultimate fact determined by the Court of Appeals was title to trust lands claimed by other individual defendants. Title to that land is no longer in issue. This case, on remand, does not concern the power of the Court to decide issues already determined by a prior, distinct pro-

---

4. This Court is puzzled by the Court of Appeals' statement that the Tribe should "point out specific evidence relied upon to show avulsion on the particular land claimed by the State." 614 F.2d at 1161. A cursory reading of either the Tribe's Post-Trial Proposed Find-

ings or the Record the Tribe developed at trial would have revealed that its claim against the State did not rely upon proof of pre-1923 avulsions. This Court does not, therefore, deem that statement controlling on remand.

ceeding. Neither collateral estoppel, therefore, nor any exception to the doctrine based on reallocations of burden of proof, apply to this stage of the proceeding.

■ Nonetheless, the State cannot require the Tribe to prove river movements over eastern trust lands the State does not claim, the title to which was quieted in the Tribe against other defendants. The decision of the Court of Appeals did not resolve an issue of fact common to the issues now before this Court. The fact that the burden of proof differed concerning other land and other parties is of no consequence to the Tribe's claim against the State.

It does not matter that the Court of Appeals did not finally determine the nature of the pre-1923 river movements over eastern trust lands. That issue is no longer relevant. The State does not claim title to any eastern trust lands affected by the pre-1923 river and governed by the Court of Appeals' mandate. Proof of pre-1923 river changes is not essential to the Tribe's claim against the State. The decision of the Court of Appeals quieting tribal title to land lying east of the State's claims, therefore, constitutes the law of this case.

The Eighth Circuit Court of Appeals has repeatedly stated:

> When a case has been decided by this court on appeal and remanded to the District Court, every question which was before this Court and disposed of by its decree is finally settled and determined. The District Court is bound by the decree and must carry it into execution according to the mandate.... That Court is without power to do anything which is contrary to either the letter or spirit of the mandate.... *Thornton v. Carter*, 109 F.2d 316, 319–320 (8th Cir. 1940); *Houghton v. McDonnell Douglas Corp.*, 627 F.2d 858, 865 (8th Cir. 1980); *Paull v. Archer-Daniels-Midland Co.*, 313 F.2d 612 (8th Cir. 1963).

To require the Tribe to reassert its evidence of river movements over land which it owns under the Court of Appeals mandate would be contrary to the decree this Court is bound to execute upon remand of this action.

Accordingly, the evidence which is relevant to the Tribe's claim against the State is that which concerns the movement of the river, from 1923–1943, over the land the State claims.

LEGEND

Abandoned Lands, Date of Last Title Transfer Prior to the Entry of the Missouri River Upon Said Land

Lands Which Title Have Always Been in the Omaha Indian Tribe Since 1854

Allotted Lands Relinquished Back to the Omaha Indian Tribe

IOWA

MONONA COUNTY

PLATE 1
Exhibit T80

SOUTH BOUNDARY OF OMAHA INDIAN RESERVATION (

EXHIBIT

TRACT 1 BLACKBIRD

NEBRASKA AND E

OF INDIAN AFFA

LAND RECORD

PLATE 2
The 1923 River

SOUTH BOUNDARY OF OMAHA INDIAN RESERVATION (1855

PLATE 3
The 1927 River

EXHIBIT
TRACT 1 BLACKBIRD BE

1927 MISSOURI RIVER HIGH W
(JANUARY)

PLATE 4
The 1928 River

PLATE 5
The 1930 River

PLATE 6
The 1937 River

888

PLATE 7
The 1940 River

PLATE 8
The 1944–1945
River

EXHIBI
TRACT 1, BLACKBIRD
1944-1945 MISSOURI RIVER H
AND
NAVIGABLE CH

### III.  THE MISSOURI RIVER BETWEEN 1923–1943

A.  U.S. Corps of Engineers maps and aerial photographs trace the location of the river during this period.  In 1923, (Exhibits W–04; T–35; T–105, composite), the river flowed north to south through Nebraska Sections 10, 11, 14 and 15.  (341:8)  When it reached the southeast corner of Section 15, the river made a 90 degree angle turn to the east, traversing the southern portion of Sections 14, 13 and 18.  The river then turned south and left the Barrett Survey area.  The land on the east bank, in Sections 11, 14, 13 and 18, was supporting some vegetation, consisting primarily of small willows.

After 1923, the river became "braided." (1073:12–14)  That is, the river flowed in a wide riverbed, with many channels. (1101:23–25)  From 1923 to 1927 (Plate 3), the left bank of the river migrated a mile to the east, into Sections 13 and 24.  (2084:12) (Exhibits W–54, T–36, T–106, composite) In 1928, the riverbed extended from the western half of Section 15, across Section 14, to the west half of Sections 13 and 24. (Exhibit T–107)  The maps, photographs, and expert testimony indicate that the left bank in Sections 13 and 24 consisted of fast, stable land supporting willows and other vegetation.  (Robinson 1075:13–16; 1078:10–16; 1081:17); (Exhibit T–107, composite); (Clark-358).  The 1928 left bank marks the farthest eastern progression of the river in the Barrett Survey during this period.  (Plate 4)

After 1928, the river migrated westward away from the 1928 eastern high bank.  In 1930, the left bank of the river ran in a southeasterly direction across Sections 10 and 14.  A large, continuous sand bar developed between the fast, stable land in Section 13 and the receding left bank.  (Huber 2086:12–16)  The location of the river in 1930 is indicated by Exhibits T–41, V–4, T–108 and Iowa H–8.  (Plate 5)  Through 1932, the river continued to recede westward.  (1085:17–20);  Exhibit  109; (1098:23–25)

In 1936, the Corps of Engineers began construction of structures in the Blackbird Bend area designed to train the river into a fixed alignment.  433 F.Supp. at 86. (2092:10)  The projects consisted of dikes and an abatis.  Several private individuals [5] also constructed levees across the Barrett Survey lands.  The Corps constructed dike 749.3, in a southwesterly direction across Sections 14 and 15.  Exhibit, Wilson D–5. Additionally, a private structure (the Peterson levee) was built north to south across the western half of Section 13.  This levee coincides with the farthest eastern progression of the river after 1923.  Exhibit, Wilson I–5.  Another private structure (Kirk levee) and an abatis built in the northwest corner of Section 13 also affected the course of the river across the western Barrett Survey.

The maps and photographs of the river in 1937 (Exhibit B–5), 1939 (Exhibit D–5) and 1940 (Exhibits F–5 and G–5) show the progressive westward movement of the main channel until it reached the 1940 designed channel.  (Plates 6 and 7)  The river receded substantially from Sections 11, 14 and 23 by 1937.  In 1939, there was fast, stable land in Section 11 and in the eastern half of Section 14, supporting willows and other vegetation.  By 1940–1941, the river was largely confined to a single channel which corresponded approximately to the 1943 Iowa-Nebraska Boundary Compact line. Exhibits I–8 and Wilson G–5.  Intermittent channels crossed sand bars on the left bank in Sections 10, 11, 15, 22, 23 and the western edge of Section 14.  These sand bars showed characteristics of permanence, including vegetation.

Having established the location of the river during this period, this Court will review the testimony concerning the nature of the river movements.

B.  The Tribe asserts all of the land west of Sections 13 and 24 in the Barrett Survey formed as accretions to eastern tribal lands.  The Tribe relies upon the testimony of its own expert witnesses, Doyle Abrahamson

---

5. Defendant's predecessors in interest, Kirk and Peterson.

(surveyor), Dr. Charles Robinson (geologist), and Elmer Clark (surveyor).

1.  Mr. Abrahamson testified specifically concerning the location and obliteration of the "fee patented" lands in the western Barrett Survey. Exhibit T–80 (1416:1, *et seq.*) As the river moved eastward after 1923, land in the western Barrett Survey eroded away. "Fee patented" lands in Sections 10, 11, 14 and 15 were destroyed shortly after 1923. (1417–1419). Other fee land in Section 14 eroded away by 1927. (1419:17) By 1928, the river had obliterated fee land in Sections 22 and 23. (1420:8) Finally, by 1930, Abrahamson concluded "all of the fee patented tracts had been obliterated." (1420:22–23) Relinquished allotments in the western Barrett Survey were likewise eroded away by 1930. (1424:9)

    Abrahamson drew a line across the western half of Section 13. This line marked the farthest eastward progression of the river after 1923. Lands east of this line were not obliterated by the river during this period. (1425:7, *et seq.*) Additionally, this line coincided with a "relief" which Abrahamson observed on the ground across the western half (W2) of Sections 13 and 24. (1421:18) By the term "relief," he meant a difference in elevation between the eastern "not obliterated" lands and those tracts in the western Barrett Survey. He concluded the land to the west of this "relief" constituted a continuous piece of land, extending to the present location of the river. (1422:10, 1428:20)

2.  Dr. Robinson's conclusions are consistent with Abrahamson's testimony. He conducted soil composition studies of both the surface and subsurface geology of the Blackbird Bend area. (790–792) He agreed that Barrett Survey lands in Sections 13, 19, 20 and 24 were not obliterated by the river when it travelled east to its 1928–1930 position. (1292:19–22). The western Barrett Survey was part of the riverbed during this period. Dr. Robinson stated the river moved westward after 1928 and the artificial structures built in the mid-1930s aided this process. (1102:11–12) The purpose of the Corps' projects was to confine and "straighten" the river. Consequently, the river's "gradient increased and the erosive power of the river was increased, and the level (of the riverbed) dropped...." (1094:3–9) Dr. Robinson concluded that the river eroded the land in the western Barrett Survey when it moved west after 1930, because the dikes and abatis caused the river to be "shortened" and because the level of the riverbed was lowered. (1096:24–25) As a result of the lower river level, land in Sections 11, 14 and 23 reemerged and became stable. (1094:11–18) These new lands were "continuous," extending from Section 13 westward. (1097:10–16) Dr. Robinson testified that the reemergence of new land was an "imperceptible" change occurring after 1923. (1096:5–8). The western Barrett Survey land which appeared as the river receded is identifiable and in place today. (1098:25–1099:1)

3.  The Tribe's witness, Mr. Clark, observed that river levels in the Blackbird Bend area reflected a wet cycle from 1920–1930 and a drought period from 1930–1940. (505:9–11) He stated the Corps' dikes and abatis, together with private structures, diverted the river westward in the Barrett Survey and prevented the encroachment of the river upon eastern Barrett Survey land. (398–399) Additionally, upstream impoundments of the river after 1935 affected the flooding, erosion, accretion and reliction of the river throughout the western Barrett Survey. (502, 520–521)

    Summarily, the Tribe's witnesses agreed that western Barrett Survey lands were first obliterated by the eastward progression of the river from 1923–1928; new land reappeared in this area attaching by accretion and reliction to Sections 13 and 24 when the

river eroded and receded westward from 1928–1943. Defendant's experts drew substantially the same conclusion.[6]

Most significant is the testimony of Mr. Raymond Huber concerning the effect of the dikes and abatis built in the Barrett Survey during this period. (2092:23, *et seq.*) The dikes served to "train the river over into the alignment which was designed by the Corps of Engineers." (2092:23–24) A dike, Huber stated, causes deposition and accretion to riparian land because it slows the current of the river.[7] (2094:3–4) Huber also referred to the private levees constructed to drain as well as to shield eastern Barrett Survey lands from encroachment by the river. (2101:3) None of these structures, he concluded, were built to cause an avulsion. (2095:10)

4. The growth of vegetation during this period, as shown by the maps and photographs, is consistent with the movement of the river by erosion against the right bank and accretion deposition and reliction to the left bank.[8] Similarly, soil samples taken from the western Barrett Survey consist primarily of silts, fine sand or very fine sand. Exhibit, Gov't 151. These materials are not cohesive and are easily erodable. (2587:13–16) These are soils typically deposited in an alluvial floodplain following the migration of a river.

C. *The State of Iowa's island and abandoned channel theory*

Under the terms of the Iowa Nebraska Boundary Compact, the area claimed by the State of Iowa was ceded by the State of Nebraska. Therefore, Nebraska law governs title claims based upon land formed in this area prior to the Compact date of July 12, 1943. *Nebraska v. Iowa*, 406 U.S. 117, 120, 92 S.Ct. 1379, 1381, 31 L.Ed.2d 733 (1972). However, Iowa law controls events occurring after the Compact date. *State v. Simmons*, 290 N.W.2d 589, 593 (Iowa 1980), *cert. denied*, 449 U.S. 842, 101 S.Ct. 123, 66 L.Ed.2d 50 (1980). In Iowa, the State owns the bed of all navigable streams from the ordinary high water mark to the "thread" or center of the stream, as well as all islands arising therefrom. *Mather v. State*, 200 N.W.2d 498, 500 (Iowa 1972). In Nebraska, the riparian proprietor owns the riverbed to the thread of the stream and all islands which develop by accretion to the stream bed. *Valder v. Wallis*, 196 Neb. 222, 242 N.W.2d 112 (1976); *Thies v. Platte Valley Public Power and Irrigation District*, 137 Neb. 344, 289 N.W. 386 (1930).

The State of Iowa admits the western edge of the Barrett Survey was part of the bed of the Missouri River between 1923 and 1931.[9] The State, however, asserts the land it claims consists of an island and exposed, abandoned river channels which did not form until after 1943. These lands, the State contends, developed in the Iowa portion of the riverbed, apart from the Iowa high bank. Therefore, the State of Iowa

---

6. *See*, testimony of Dr. George Hallberg (geologist), at 2654:18; 2690, *et seq.* Significantly, Hallberg concluded the land in Section 11 was formed after 1927 by "accretion type bar deposits." (2702:8–24) And land in Sections 14 and 23, as shown on the 1940 map, were accretions to the east bank. (2708:20–2709:8) *See also*, Testimony of Mr. Huber, who worked in this area for the Corps of Engineers after 1936. (1982:8; 2083:2, *et seq.*) He agreed the western and southern portions of the Barrett Survey were eroded away through 1928 and 1930. (2085:3–17; 2086:7–10) Huber concluded, generally, that from 1923 to 1940, the river moved east and then west, by erosion and accretion. (2102:23–2103:3).

7. An abatis likewise slows the flow of the river, causing deposition downstream as well as upstream. (2131:20–25) Huber testified an abatis in the Barrett Survey formed accretions in Section 14. (2143:17)

8. The Court of Appeals noted: "A large stand of timber shown in the northwest corner of the Barrett Survey area prior to 1923 was no longer visible in a 1927 aerial survey of the area, indicating the land on which it stood had been eroded." 575 F.2d at 649, n. 65.

9. Iowa Proposed Findings and Conclusions, on Remand, No. 40. *See*, Exhibits R–4, S–4, V–4, Y–4, 41 and 42.

claims title to the tracts based upon the Equal Footing Doctrine and the doctrine of state ownership of the bed of navigable streams. *Montana v. United States,* 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); *Oregon, ex rel. State Land Board v. Corvallis Sand and Gravel Co.,* 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977); *State v. Simmons, supra; Mather v. State, supra.*

The Tribe contends that the land occupying the area the State claims developed as accretions and relictions to riparian tribal land, not as an island or abandoned channel. The United States argues, alternatively, that if an island did form, it was a permanent formation prior to 1943. Under Nebraska law, the Government and the Tribe, as riparian land owners, would also own the "island."

The State's claim under the doctrine of state ownership of the bed and banks of navigable rivers is inconsistent with the theory upon which it relied at the close of the trial of this case. The State joined in the post-trial brief of defendants, in which the State asserted the eastward movement of the river from 1923–1930. Thereafter, the State agreed the river moved westward by accretion to the left bank.[10] Significantly, the State also joined in defendant's statement that, "... all parties agree that the fee patented lands were eroded away and washed down the river. They disagree as to the ownership of the land to which the accretion land, now occupying the area formerly occupied by the fee patented land, became attached."[11] The State's position at the close of trial was that the land it claims formed as accretions to riparian mainland owned by other defendants, who conveyed their interest in such lands to the State by quit claim deeds. Specifically, the State joined in asserting Proposed Conclu-

sion of Law, No. VII, which concluded that all of the land within the Barrett Survey formed as accretions to the left or Iowa bank, prior to 1943.

The State on remand, however, proposed that the land it claims did not accrete to the left bank prior to 1943. Instead, it asserts the tracts formed as an island accreting to the riverbed apart from the left bank, and as an abandoned river channel, after 1943.

■ An island traditionally is defined as a permanent body of land, separate and distinct from the mainland, and above mean high water. An island must be surrounded by distinct channels of the river, which separate the island from the mainland. *Burket v. Krimlofski,* 167 Neb. 45, 91 N.W.2d 57 (1958); *Summerville v. Scotts Bluff County,* 182 Neb. 311, 154 N.W.2d 517 (1967); *State v. Raymond,* 254 Iowa 828, 119 N.W.2d 135 (1963); *Mather v. State, supra.*

The State of Iowa presented no testimony at trial to support its post-1943 "island" and abandoned channel theory. Nonetheless, the State refers to maps and aerial photographs of the western Barrett Survey.[12] These exhibits allegedly trace the development of an "island" adjacent to and south of dike No. 749.3, in Sections 14, 15 and 23. The area adjacent to and north of the dike is the land the State claims as an abandoned river channel. A 1944–1945 aerial photographic mosaic, the State concludes, depicts an "island" in permanent existence for the first time. Wilson Exhibit H–5. The State claims this island formed as a sandbar within the Iowa portion of the riverbed, separated at all times from the Iowa shore by a well-defined channel.[13]

In considering a claim that an island arose from the riverbed, separated from both riparian banks, certain evidence is rel-

---

**10.** Defendant's Post-Trial Brief, filed February 16, 1977, at p. 30.

**11.** *Id.* at 46.

**12.** Exhibits Wilson K–K, L–L (photographs of dike); Wilson Exhibits B–5 (1937 Corps map); F–5 (1940 map); G–5 (1941 map); *see also,* Wilson Exhibits J–5, K–5, and M–5; Iowa Exhibits H08, I08, K08 (Mylar overlays).

**13.** The State argues that dike 749.3 contributed to the development of Ivy Island from a sandbar in the riverbed. In its Proposed Findings and Conclusions, post-trial, however, the State asserted, "[t]hese dikes and abatis had the effect of forming accretion to the Iowa riparian land adjacent to the dikes (2093:24)." at p. 36.

evant. For example, in *Tyson v. State of Iowa*, 283 F.2d 802 (8th Cir. 1960), the Eighth Circuit Court of Appeals considered eye witness testimony, photographs, land surveys, and dendrochronology studies reporting the size, age and location of vegetation. In this case, the State offered no testimony, eye-witness or otherwise, supporting the development of an island and abandoned river channel. This fact is particularly remarkable in view of the time period involved. Witnesses would certainly be available to testify concerning developments occurring only after 1943. The State offers photographic evidence of its theory, however.

Specifically, the State relies upon the 1944–1945 photomosaic, depicting the "island" as a permanent formation. On this basis, the State contends the island could not have developed prior to 1943. Unfortunately, no photograph offered by the State depicts the area as it appeared *in 1943*. There is a gap of three years in the State's proof—from 1941 (photo exhibit G–5) to 1944–1945 (exhibit H–5). The State wishes this Court to speculate concerning the permanence of the land it claims in light of the development of vegetation. It is, however, only an "educated guess" by the State that vegetation appearing in 1944 was not also present and permanent before 1943. Indeed, the land in the area of the State's claims does appear to be supporting some vegetation in the 1941 aerial photograph. Additionally, the Tribe offered Exhibit 105A, a summary of a dendrochronology study of Blackbird Bend conducted by George S. Gorsuch. (1357:4, *et seq.*). In the area comprising the State's claimed "island," the study located some cottonwoods aged forty-two years, originating in 1943. It is undisputed that cottonwoods are secondary vegetation, which will not grow until after the land is dry, established, and capable of supporting primary growth, such as willows. 433 F.Supp. at 76. As the Court of Appeals stated, "... vegetation does not usually appear on a sandbar until it has been in existence for several years." 283 F.2d at 810.

Therefore, this Court concludes the State, on remand, referred to only speculative evidence concerning its claim that Ivy "Island" was a permanent formation only after 1943. Moreover, the State cited no testimony concerning the formation of an independent island—in order to refute its previous position that the land comprising Ivy "Island" constituted accretions to the left bank. The State offered no evidence at trial concerning the nature of the channel which it claims separated the "island" from the left bank. Aerial photographs taken in 1945 and 1954 could equally support the conclusion that Ivy "Island" was surrounded by water "only when the river [was] high and connected with the mainland when the river [was] low." *Mather v. State*, 200 N.W.2d 498, 501 (Iowa 1972). In fact, Doyle Abrahamson testified that the stream appeared to the east of the "island" after the land had already formed as accretions and relictions to the left bank. (1427:19–1429:14). Accordingly, the Tribe argues it retains title to the accretions. This position is consistent with the law of Nebraska, which provides, "[w]here an accretion was begun by a deposit against the shores of the mainland, the subsequent existence of an intermediate stream between the mainland and the accretion does not prevent the accretion from belonging to the mainland owner." *Independent Stock Farm v. Stevens*, 128 Neb. 619, 259 N.W. 647, 649 (1935).

## FINDINGS OF FACT ON THE MERITS

From all the evidentiary matters considered, the Court finds:

1. That in 1923, the Missouri River cut entirely across Nebraska Sections 10, 11, 14 and 15, within the Barrett Survey. By the process of erosion, the riverbed and the left bank were obliterated.

2. That from 1923 to 1928, the river gradually migrated eastward in the Barrett Survey. During this migration the river eroded and obliterated land occupying the left bank and the riverbed. The 1928 left bank of the river represented the farthest eastern migration of the river in the Barrett Survey after 1923.

3. That in 1928, the left bank of the river occupied the west half of the west half of Sections 13 and 24. The river occupied substantially all of the tracts claimed by the State of Iowa as well as the entire area described in the fee patents which individual defendants claimed. As a result of the erosion of the river through 1928, all of the land within the Barrett Survey west of the 1928 left bank was obliterated and no identifiable land remained in place.

4. That from 1928 to 1943, the Missouri River reversed its direction and migrated westward over the Barrett Survey. The river further eroded and excavated the right bank and gradually and imperceptibly deposited silt and sediment upon the left bank. These accretions attached to fast, stable land in Sections 13 and 24 which were riparian to the left bank of the river between 1927 and 1930.

5. That artificial structures, including an abatis, dikes and levees were constructed across the western Barrett Survey by both the Corps of Engineers and private individuals. The purpose of these structures was to create accretions to land adjacent to the structures, to drain or protect eastern Barrett Survey lands, and to train the river into a designed channel. These structures contributed to the gradual subsidence of the river, westward, from the 1928 left bank. By this additional process of reliction, new lands were uncovered and added to the left bank.

6. That by 1943, the accretions and relictions were new lands contiguous to Sections 13 and 24 and continuous westward to the present location of the Missouri River. Subsequent to the formation of these continuous accretions, an intermediate stream cut across Sections 10, 11, 14, 15, 22 and 23. This stream separated accretions adjacent to the Iowa-Nebraska Compact Line from the mainland, thereby creating the body of land known as Ivy "Island." Ivy "Island," therefore did not form by accretion to the riverbed, below the ordinary high watermark.

7. That the State of Iowa presented no evidence to establish a factual predicate for its conclusion, on remand, that the land south of dike No. 749.3 formed as an island in the Iowa portion of the riverbed after 1943 or that the land north of dike No. 749.3 is an abandoned river channel. This Court's findings concerning the tracts claimed by the State of Iowa are not based upon inferences drawn from any weaknesses in the State's evidence tending to prove its island and abandoned channel theory. Rather, the findings of this Court are based upon the clear preponderance of the evidence, presented by both the Tribe and defendants, that the river changed during this period by creating continuous accretions and relictions to the left bank riparian land.

8. That there is no substantial evidence defendants or their predecessors possessed any fee patented tracts during the time the river occupied the western Barrett Survey from 1923 to 1930.[14] The dry lands defendants occupied after the river finally receded from the western Barrett Survey were not the original fee patented lands. The defendants entered upon new lands formed by accretion and reliction to stable land in Sections 13 and 24. These accretions replaced the fee patented tracts which were eroded and washed away by the river prior to the entry by defendants or their predecessors.

9. That no party to this case either pleaded or submitted evidence to prove that the river moved by avulsion from 1923–1943.

## CONCLUSIONS OF LAW

█ 1. The Court of Appeals ordered this Court to quiet title to the trust lands involved in this action, except those claimed by the State of Iowa, in the United States as trustee, and in the Omaha Tribe. This order establishes as the law of this case that the Tribe is the owner of all Barrett Survey

---

14. For example, concerning the fee patented tracts, counsel for defendant stated: "We know nothing about them being abandoned ex-cept nobody was occupying them while they were in the bottom of the river." (113:8–10)

land east of and including Sections 13 and 24. Additionally, based upon the Court of Appeals' mandate, the United States and the Tribe own those allotted parcels to which trust patents were issued but subsequently relinquished or cancelled—except those claimed by the State of Iowa.[15] The river movements relevant to the ownership of the remaining lands within the western Barrett Survey are those described above, which occurred from 1923–1943. Both the Tribe and the defendants offered proof that the river changed by accretion and reliction.

2. Federal law, borrowing the Nebraska rule of decision, governs this Court's determination of river movements over Barrett Survey land. The prior opinions in this case set out the law of accretion and reliction in Nebraska. 433 F.Supp. at 62–65; 575 F.2d at 633–639; 614 F.2d at 1156–1160. Two elements are essential to a finding of accretive changes in a river: First, "[a] boundary changes only where the river's change of channel is caused by a process of erosion or excavation of earth from one bank and deposition of identifiable silt and sediment on the other—the land between the old and new channels must be completely disintegrated." 614 F.2d at 1157; *State v. Ecklund*, 147 Neb. 508, 23 N.W.2d 782, 789 (1946); second, "... no matter how 'rapid and great' is 'the abrasion and washing away,' or 'the diminution' of soil, the accretion (or reliction) of soil 'is always gradual and by imperceptible deposit of floating

particles of earth.'" 614 F.2d at 1157, quoting, Nebraska v. Iowa, 143 U.S. 359, 368–369, 12 S.Ct. 396, 399, 36 L.Ed. 186 (1892). Both elements must be present.

"Reliction" is the term applied to land added and uncovered by a gradual subsidence of water from any cause. *Durfee v. Keiffer*, 168 Neb. 272, 95 N.W.2d 618 (1959); *Jones v. Schmidt*, 170 Neb. 351, 102 N.W.2d 640 (1960); *Dartmouth College v. Rose*, 172 Neb. 764, 112 N.W.2d 256 (1961). Land added by either accretion or reliction to riparian land is the property of the riparian owner. *Id.; Fontenelle v. Omaha Tribe of Nebraska*, 298 F.Supp. 855, 859 (D.Neb. 1969), *aff'd*, 430 F.2d 143 (8th Cir. 1970).

3. The Tribe sustained its burden of proving, by a clear preponderance of the evidence, (a) that the tracts claimed by the State of Iowa were washed away by the action of the river eroding its bed and banks; and (b) that by a gradual and imperceptible process of deposition and reliction, new lands were created which attached to and extended westward from riparian tribal trust lands in Sections 13 and 24, continuously, to the present location of the river. The State of Iowa, therefore, has no claim or right thereto based upon river movements occurring after 1923.[16]

The Tribe proved the accretions and relictions to tribal land were caused, in part, by the projects of both the Corps of engineers and private individuals.

---

15. Allotted lands are owned by the United States, as trustee, for the benefit of the allottee. *See*, 25 U.S.C. § 348; *Tooahnippah v. Hickel*, 397 U.S. 598, 90 S.Ct. 1316, 25 L.Ed.2d 600 (1970); *County of Thurston, State of Nebraska v. Andrus*, 586 F.2d 1212 (8th Cir. 1978), *cert. denied*, 441 U.S. 952, 99 S.Ct. 2181, 60 L.Ed.2d 1057 (1978). It follows that the allotted tracts remain trust lands whether the patent is subsequently relinquished or cancelled under 25 U.S.C. § 344. As such, the tracts are governed by the Court of Appeals' order to quiet the Tribe's title in trust lands claimed by the individual defendants.

16. The State's claim to western Barrett Survey lands based upon quitclaim deeds from other defendants also fails. A quitclaim is used by a grantor to convey only such interest as he has, in contradistinction to a grant of the fee or other estate with warranty of title. *United

States v. Speidel*, 562 F.2d 1129 (8th Cir. 1977), *cert. denied*, 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 505 (1977); *Walters v. Walters*, 231 Iowa 1267, 3 N.W.2d 595 (1942); *Mack v. Tredway*, 244 Iowa 240, 56 N.W.2d 678 (1953); *Swab v. Appanoose Country Club*, 203 N.W.2d 318 (Iowa 1972); *Kennedy v. Potts*, 128 Neb. 213, 258 N.W. 471 (1935); *Smith v. Berberich*, 168 Neb. 142, 95 N.W.2d 325 (1959). "[U]nder a conveyance by a quitclaim deed the grantee can acquire no better interest than the grantor had. If the grantor himself has no title or interest to the property conveyed, most courts hold that the grantee takes nothing under a quitclaim deed...." 23 Am.Jur.2d, *Deeds* § 291, at p. 324. Based upon this Court's findings and conclusions, the individual defendants had not title to western Barrett Survey land. It follows that the State takes no title under a quitclaim deed from the defendants.

It is well settled that the fact that artificial means caused, in whole or in part, the working of the processes of accretion or reliction does not affect the rule that a riparian owner takes new land formed against his tract. *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 94 S.Ct. 517, 138 L.Ed.2d 526 (1973), *rev'd on other grounds*, 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550; *County of St. Clair v. Lovingston*, 90 U.S. (23 Wall.) 46, 23 L.Ed. 59 (1874); *Duke v. Durfee*, 215 F.Supp. 901 (D.Mo.1961), *rev'd on other grounds*, 308 F.2d 209 (8th Cir. 1962), *rev'd*, 375 U.S. 106, 84 S.Ct. 242, 11 L.Ed.2d 186 (1963); *Kansas v. Meriwether*, 182 F. 457 (8th Cir. 1910). In *Krumweide v. Rose*, 177 Neb. 570, 129 N.W.2d 491 the Nebraska Supreme Court referred to a channelization project similar to that of the Corps of Engineers in this case. The court held, "... this development work finally resulted in the destruction of the western channel ... and the acceleration of accretion.... The fact that third parties performed construction work and accelerated these processes does not alter the application of the rule as to ownership of accretion land." 177 Neb. 570, 129 N.W.2d 491, 496 (1964). *Accord, Valder v. Wallis*, 196 Neb. 222, 242 N.W.2d 112 (Neb.1976); *Krimlofski v. Matters*, 174 Neb. 774, 119 N.W.2d 501 (1963); *Ziemba v. Zeller*, 165 Neb. 419, 86 N.W.2d 190 (1957).[17]

4. By virtue of the Court of Appeals mandate, the United States, as trustee, and the Tribe own trust lands in Sections 13 and 24 of the Barrett Survey. These lands were riparian to the 1928 left bank of the Missouri River, when it moved easterly in the Barrett Survey. Accretions to land owned by the United States in Sections 13 and 24 are also lands owned by the United States. *United States v. Boyd*, 458 F.2d 1252 (6th Cir. 1972); *United States v. Claridge*, 416 F.2d 933 (9th Cir. 1969), *cert. denied*, 397 U.S. 961, 90 S.Ct. 994, 25 L.Ed.2d 253 (1970); *Beaver v. United States*, 350 F.2d 4 (9th Cir. 1965), *cert.*

*denied*, 383 U.S. 937, 86 S.Ct. 1067, 15 L.Ed.2d 854 (1966). This general rule applies equally to lands which the United States owns in trust for an Indian tribe. *Wilson*, 442 U.S. at 673, 99 S.Ct. at 2540; *Fontenelle v. Omaha Tribe of Nebraska*, 430 F.2d 143 (8th Cir. 1970); *United States v. Flower*, 108 F.2d 298 (8th Cir. 1939); *Newman v. United States*, 504 F.Supp. 1176 (D.Ariz.1981).

5. The Court of Appeals first observed that "[t]he Government excepted from its complaint any claim to approximately 400 acres of land which may have been allotted to individual Indians and subsequently patented to non-Indians." 575 F.2d at 651, n. 70. The United States Supreme Court also noted several hundred acres of land within the Barrett Survey were claimed as fee patented lands. 99 S.Ct. at 2529. Individual defendants, as well as the State of Iowa, claimed title to the "fee patented" lands under Nebraska laws regarding adverse possession, statutes of limitation and laches.[18] The Tribe, however, proved defendants never possessed the actual land described in the fee patents because the river obliterated and eroded the fee lands prior to defendants entry thereupon. The lands defendants occupied after the river finally receded were accretions to eastern tribal lands in Sections 13 and 24. Consequently, the Tribe argued the defendants cannot adversely possess accretions to Indian trust lands, nor may state statutes of limitation or laches operate to divest Indian title.

It is true that Indian lands, once patented in fee, lose their status as trust lands and are governed by state law. *Larkin v. Paugh*, 276 U.S. 431, 48 S.Ct. 366, 72 L.Ed. 640 (1928); *Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 377, 97 S.Ct. 582, 590, 50 L.Ed.2d 550 (1977); *Wilson*, 442 U.S. at 671, 99 S.Ct. at 2539. This Court finds and concludes, however, the Tribe established by a preponderance of evidence that the river eroded

---

17. *See also*, Lundquist, *"Artificial Additions To Riparian Land: Extending the Doctrine of Accretion*, 14 Ariz.L.Rev. 315 (1972); Beck, *The Wandering Missouri River: A Study in Accre-* *tion Law*, 43 N.D.L.Rev. 429, 449 (1967); 63 A.L.R.3d 249.

18. Neb.R.R.S., § 25–202 (1943).

the lands in the western Barrett Survey area, including those described in the fee patents, and replaced those lands with accretions and relictions to trust lands in place in Sections 13 and 24.[19] In both Nebraska and Iowa, the effect of such a movement of the river is to destroy the title to the land obliterated by the movement of the river. *State v. Matzen,* 197 Neb. 592, 250 N.W.2d 232 (1977); *Winkle v. Mitera,* 195 Neb. 821, 241 N.W.2d 329 (1976); *Rupp v. Kirk,* 231 Iowa 1387, 4 N.W.2d 264 (1942); *Wilcox v. Pinney,* 250 Iowa 1378, 98 N.W.2d 720 (1959). This Court cannot, therefore, apply state laws of adverse possession or laches based upon the former title to the lands in fee patent.[20] Application of those laws, if at all, must be based upon the present character of the title to the accretions.

◾◾◾ It is well settled that title by adverse possession, laches, or statutes of limitation cannot be asserted against the United States, *United States v. Denby,* 522 F.2d 1358 (5th Cir. 1975), *reh. denied,* 525 F.2d 693 (5th Cir. 1975); against *land* which

the United States owns in trust for an Indian tribe, *United States v. 7,405.3 Acres of Land,* 97 F.2d 417 (4th Cir. 1938); *Oneida Indian Nation of New York v. County of Oneida,* 434 F.Supp. 527 (N.D.N.Y.1977); *Schaghticoke Tribe v. Kent School Corp.,* 423 F.Supp. 780 (D.Conn.1976); or against land which the United States gains by accretion. *Jackson v. United States,* 56 F.2d 340, 343 (9th Cir. 1932); *Beaver, supra; Claridge, supra.* Since the lands which defendants eventually occupied in the western Barrett Survey were no longer the fee patented lands, but were accretions to tribal lands owned by the United States for the Omaha Tribe,[21] the defenses of adverse possession, etc., are meritless. The new lands forming westerly from Sections 13 and 24 became tribal lands which never were allotted or conveyed to a restricted Indian. The law compels this conclusion even though the new lands occupied the same area described in the fee patents. *See, e. g., United States v. Russell,* 261 F.Supp. 196 (E.D.Okl.1966).

Defendants cite *Dillon v. Antler Land Co.,* 507 F.2d 940 (9th Cir. 1974) for the rule

**19.** The defendants contended 25 U.S.C. § 194 did not operate to place upon them the burden of proof concerning river movements affecting "fee patented" lands. This Court need not address that issue. Even if 25 U.S.C. § 194 did not apply and the Tribe had the burden of proof, this Court holds the Tribe established by a clear preponderance of the evidence its right and claim to the land occupying the area described in the fee patents.

There can be no doubt, however, that 25 U.S.C. § 194 has been a determinative factor in the outcome of this case. In the Appellate stages of this proceeding, this previously untested statute operated to shift the ordinary burden of proof in a quiet title action to the individual defendants. This enormous burden included the task of describing the nature of river movements which occurred beginning over 100 years ago. This Court firmly believes the statute thereby provided the Tribe an unconscionable advantage in this litigation. Moreover, the statute arguably operated to deprive these defendants of their constitutional right to equal protection under the law. In this age, Indian Tribes are often sophisticated corporations which litigate claims using the legal and financial resources of the United States Government. Consequently, this Court believes the special treatment afforded an Indian Tribe under 25 U.S.C. § 194 no longer "can be tied rationally to the fulfillment of Congress'

unique obligation toward the Indians...." *Morton v. Mancari,* 417 U.S. 535, 555, 94 S.Ct. 2474, 2485, 41 L.Ed.2d 290 (1974). Although this issue was not properly before this Court, we would welcome a challenge of the statute, on constitutional grounds, in future cases.

**20.** Defendants do not claim to derive title from any original fee patent holder. Rather, they assert title by adverse possession. This current theory presumes the continued existence of the land described in the fee patents, but is inconsistent with defendants' theory at trial—that *all* of the Barrett Survey lands were destroyed by the river. 433 F.Supp. at 71.

**21.** This Court holds defendants did not begin to establish the "possession" required by law to constitute an adverse possession, until the river finally receded from the areas described in the fee patents, sometime after 1930. *Weiss v. Meyer,* 208 Neb. 429, 303 N.W.2d 765 (1981). Similarly, in *Pokorski v. McAdams,* 204 Neb. 725, 285 N.W.2d 824 (1979), the Nebraska Supreme Court held that a plaintiff did not establish an adverse possession. During the time the river occupied the land involved, the court found "no persuasive evidence that there was any land present ... which was subject to adverse possession." *Id.,* 285 N.W.2d at 827.

that fee patent land owned by an Indian may be acquired by adverse possession. *Dillon* did not concern land destroyed or created by accretion and reliction. Defendants continue to equate the precise fee patent land lost by erosion, with the land they occupied when the river finally receded from this area. This premise is groundless in view of the undisputed evidence, offered by both the Tribe and defendants, establishing the destruction of the fee lands by erosion.

6. The defendants finally assert the refusal of the United States to claim the former fee patented lands precludes the Tribe from so doing. Admittedly,

"... when the United States itself undertakes to represent the allottees of lands under restriction and brings suit to cancel prohibited transfers, such action necessarily precludes the prosecution by the allottees of any other suit for a similar purpose *relating to the same property.*" *Poafpybitty v. Skelly Oil Co.,* 390 U.S. 365, 370, 88 S.Ct. 982, 984, 19 L.Ed.2d 1238 (1968) (Emphasis added).

But this rule does not bar the Tribe from recovering tribal lands when the United States refuses to claim the same lands on behalf of the Tribe, or from recovering lands in addition to those the Government claims.

■■■■■ This Court concludes the Tribe may bring an action to recover accretions to tribal lands, notwithstanding the refusal of the United States to add these lands to its complaint in these consolidated cases. Clearly, "... Congress intended by (28 U.S.C.) § 1362 to authorize an Indian tribe to bring suit in federal court to protect its federally derived property rights in those situations where the United States declines to act." *Fort Mojave Tribe v. Lafollette,* 478 F.2d 1016, 1017 (9th Cir. 1973). "In recovering these lands, the Indians assert not merely their own rights of occupancy, but the sovereign claims of the United States as well." *Schaghticoke Tribe,* 423 F.Supp. at 784. *See also, Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 473, 96 S.Ct. 1634, 1641, 48 L.Ed.2d 96

(1976); *Capitan Grande Band of Mission Indians v. Helix Irrigation District,* 514 F.2d 465 (9th Cir. 1975). Accordingly, since the defenses of adverse possession, statutes of limitation, and laches would not be available had the United States claimed the accretions attaching to tribal trust lands, *Board of Commissioners v. United States,* 308 U.S. 343, 351, 60 S.Ct. 285, 288, 84 L.Ed. 313 (1939); *United States v. Schwarz,* 460 F.2d 1365, 1371–1372 (7th Cir. 1972); *United States v. Ahtanum Irrigation District,* 236 F.2d 321, 334 (9th Cir. 1956), *cert. denied,* 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957), the defenses will not apply to claims by the Tribe, on its own behalf, to recover the same lands. *Schaghticoke,* 423 F.Supp. at 784–785.

For the above-mentioned reasons, this Court concludes the defendants have no right or claim to any land in the western Barrett Survey, including the lands occupying the area described by fee patents.

This Court does not deviate from its original judgment that the Missouri River moved over the Barrett Survey—in all relevant periods—by accretion to the left or Iowa bank. Contrary to this Court's original decree, however, the Tribe prevails on remand. The Court of Appeals effectively determined this outcome when it quieted title in the Tribe to eastern Barrett Survey lands. Any accretion to the left bank, therefore, added to land which the Court of Appeals held was owned by the Tribe. This Court will not change its view of the evidence and cannot change the mandate of the Court of Appeals.

## IV. IMPROVEMENTS

The defendants interpose a counterclaim against the United States for the value of improvements they made upon lands, title to which is now quieted in the Tribe. The defendants assert two theories in support of the counterclaim. First, they contend the general principles of equity are binding upon the United States. As a condition for obtaining equitable quiet title relief, the government must do equity by reimbursing the defendants for improvements. Second,

the defendants assert that Nebraska law governs the claim for improvements and that they are entitled to recover under the Nebraska Occupying Claimants Act (NOCA), Neb.R.R.S., 1943 §§ 76–301 to 76–311. The United States opposes the claim for improvements for two reasons. The government contends sovereign immunity bars the claim. Additionally, the United States argues NOCA cannot apply to this action. For the following reasons, this Court concludes defendants' counterclaim for improvements is barred by the sovereign immunity of the United States.

■■■■■ The United States may be sued, even by counterclaim, only when the government has waived its immunity from suit. *United States v. Shaw*, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940); *United States v. Agnew*, 423 F.2d 513 (9th Cir. 1970). The terms of its consent to be sued define any court's jurisdiction to entertain the suit. *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). Moreover, no waiver of sovereign immunity may be implied, but must be expressed unequivocally. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976). There is no generally implied waiver of sovereign immunity when the United States commences an action. *Federal Savings & Loan Insurance Corp. v. Quinn*, 419 F.2d 1014 (7th Cir. 1969).[22]

Defendants assert the Government is bound, in equity, to pay the value of improvements since it seeks equitable relief. Defendants cite both *United States v. Desert Gold Mining Co.*, 448 F.2d 1230 (9th Cir. 1971), and *Lacy v. United States*, 216 F.2d 223 (5th Cir. 1954), and conclude "[t]he Government, when applying for relief in a court of equity is as much bound to do equity as is a private litigant." *Id.* at 225. Even the Court in *Lacy*, however, agreed that this principle cannot be pressed to the extent of waiving the United States' sover-

eign immunity to suit by way of counterclaim. *Id.*

■■■■ To interpose a counterclaim for improvements, defendants must either, (1) establish the statutory consent of the United States to the suit, or (2) state a claim in recoupment arising out of the same transaction as the claim of the United States, to which the Government impliedly consents. *United States v. Chatham*, 415 F.Supp. 1214 (D.Ga.1976); *United States v. Holder*, 292 F.Supp. 826 (D.Iowa 1968). Defendants do not identify any statute by which the Government consents to a counterclaim for improvements. Consequently, the counterclaim fails if it does not qualify as a claim in recoupment or set-off.

■■■■ Without violating the doctrine of sovereign immunity, a defendant may assert, by way of recoupment, any claim arising out of the same transaction or occurrence as the original claim, in order to defeat or reduce the Government's recovery. *Frederick v. United States*, 386 F.2d 481 (5th Cir. 1967); *See generally*, Note, *Governmental Immunity from Counterclaim*, 50 Colum.L.Rev. 505 (1950). Even within the recoupment exception, however, the Government "does not waive sovereign immunity to counterclaims . . . which claim relief in excess of or different in kind from that sought by the Government." *In re Oxford Marketing Ltd. (U. S.) v. Kallen*, 444 F.Supp. 399, 403 (N.D.Ill.1978). Accordingly, when the United States sues to quiet title, the Government consents to counterclaims by defendants seeking to quiet title in their names. *United States v. Phillips*, 362 F.Supp. 462 (D.Neb.1973).

■■■■ A recoupment is the right of a defendant, "to cut down the plaintiff's demand either because the plaintiff has not complied with some cross obligation . . . or because he has violated some duty which the law imposes upon him . . . . 20 Am.

---

**22.** The Federal Rules of Civil Procedure, Rule 13(d) affirms the general principle of sovereign immunity. It specifically states Rule 13 (regarding compulsory and permissive counterclaims) does not extend the right of a party to sue the United States beyond the limits established by statute. Wright & Miller, *Federal Practice & Procedure: Civil* § 1427, p. 139 (1971); *United States v. Longo*, 464 F.2d 913 (8th Cir. 1972).

Jur.2d, *Counterclaim, Recoupment and Set-off*, § 1, p. 228 (1965). "It means a deduction from a money claim whereby cross demands arising out of the same transaction are allowed to compensate one another, the balance only to be recovered." *Id.* For example, in an ejectment action, wherein plaintiff seeks mesne profits, the defendant may counterclaim to recoup the value of improvements. *Deakyne v. Lewes Anglers, Inc.*, 204 F.Supp. 415 (D.Del.1962). In an action by the United States to collect an income tax deficiency, a counterdemand for recoupment of an overpayment of estate taxes may be asserted in defense. *Bull v. United States*, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 (1935).

▪ When the United States, however, does not seek monetary relief, but only the return of property, the court lacks jurisdiction to entertain a counterclaim for monetary relief. In *United States v. Ameco Electronic Corp.*, 224 F.Supp. 783 (E.D.N.Y. 1963), the Government brought a replevin action to recover chattels wrongfully withheld by the defendant. The court dismissed the defendant's counterclaim for damages based on unjust enrichment because the claim did not fall within the United States' waiver of immunity for claims in recoupment.

Recoupment and set-off . . . are restricted to a reduction or in discharge of the principle claim. To accomplish this result, the claim of both the plaintiff and the defendant must be fungible obligations which can be set-off against each other. . . . The Government is not seeking a judgment for a sum of money but is asserting title to certain chattels. The very nature of the action makes it impossible to reduce or discharge the claim by recoupment or set-off. *Id.* at 786.

Similarly, in *United States v. Drinkwater*, 434 F.Supp. 457 (E.D.Va.1977), the court dismissed counterclaims seeking both damages and equitable relief because the United States sought only to quiet its title to certain land.[23]

▪ In this case, the United States seeks only to quiet title to land lying within the original boundaries of the Omaha Indian Reservation. The Government does not request the payment of damages for trespass, or for rents and profits related to the period of defendants' occupancy of the land.[24] The United States' claim, therefore, does not involve a fungible obligation against which defendant's claim for improvements may be off set. Since the counterclaim does not constitute a claim in recoupment, this Court lacks jurisdiction to entertain the claim. No specific waiver of sovereign immunity exists, express or implied, which would permit defendant's recovery of the value of improvements against the Government. *United States v. Gregory Park, Section II, Inc.*, 373 F.Supp. 317 (D.N.J.1974).

▪ This Court is painfully aware of the record in this case concerning the character of improvements made by defendants and their predecessors. *Wilson*, 433 F.Supp. at 69, 87. This Court further recognizes the obvious principle of equity, that the owner of land has no just claim to anything except the land itself. The true owner should not, without compensation, take valuable and permanent improvements constructed by a

**23.** *See also, United States v. Thurber*, 376 F.Supp. 670 (D.Vermont 1974), a mortgage foreclosure action by the United States wherein the Court dismissed counterclaims for damages because the United States did not seek a deficiency judgment or damages.

**24.** The Tribe seeks the payment of damages for trespass upon Barrett Survey lands. But that claim of the Tribe was severed and is not properly before this Court in these consolidated cases. It may be that defendant's claim for improvements could be asserted as an off-set to the Tribe's claim, even though the Tribe possesses a common-law immunity from suit which is interpreted similarly to the sovereign immunity of the United States. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 1676, 56 L.Ed.2d 106 (1978); *Chemehuevi Indian Tribe v. California State Board of Equalization*, 492 F.Supp. 55 (N.D.Cal.1979). The defendants, however, stated in their brief, on remand, that they made their counterclaim for improvements only against the United States. Defendant's Reply Brief, "On . . . Improvements," at p. 11.

claimant in the erroneous belief that he is the owner. While there is a strong policy argument for adjudicating defendant's claim for improvements in this action, "... Congress has not so declared." *Shaw*, 309 U.S. at 502, 60 S.Ct. at 662. The absence of a specific waiver of the Government's sovereign immunity limits the jurisdiction of this Court to grant such equitable relief.

This Court, therefore, need not address defendant's claim that the Nebraska Occupying Claimants Act should be applied to determine the value of improvements. Defendants stated in their brief:[25] "We do not take the position that the Nebraska Occupying Claimants Act governs directly.... We contend only that a Federal court sitting as a court of equity should follow the Act in exercise of its general equitable powers...." In support of this position, defendants cite *Leighton v. Young*, 52 F. 439 (8th Cir. 1892). *Leighton* did not concern improvements upon Indian lands, nor was an Indian tribe or the United States a plaintiff in that case. The Court of Appeals, however, recognized two relevant principles. First, the Court of Appeals observed, "[t]he equity practice in the courts of the United States is not regulated by state statutes. *Id.* at 443. Second, the Court noted, "... under the Nebraska statute the value of improvements is simply declared to be a lien on the land...." *Id.* at 444. *See*, Neb.R.R.S. § 76–306 (1943). To be more precise, NOCA § 76–310 provides that the title of the true owner may be divested by the terms of the Act if the unsuccessful claimant is not paid the value of his improvements.[26]

■ Clearly, state laws, such as the occupying claimants laws, cannot be used by federal courts, sitting in equity, to encumber or possibly divest the title of the United States to Indian lands. The United States Supreme Court held in this case, that "Indian title is a matter of federal law and can be extinguished only with federal consent...." 99 S.Ct. at 2539. Congress has not consented to the operation of NOCA in respect to lands which the Government owns in trust for the Omaha Indian Tribe.

## V. MOTIONS FOR SUMMARY JUDGMENT

The defendants moved this Court, pursuant to Federal Rules of Civil Procedure, Rule 56, for its order granting summary judgment in their favor. By these motions, defendants request the Court to dismiss the Tribe's claims to lands outside the Barrett Survey in Blackbird Bend and to quiet the title of defendants to the same lands. Additionally, defendants seek, by summary judgment, the dismissal of the Tribe's claims for damages for the alleged trespass of defendants upon all Blackbird Bend lands.

Essentially, defendants repeat the arguments in their motions for summary judgment that they made in support of their claim to the "fee patented" land within the Barrett Survey. First, defendants assert they do not have the burden of proving their superior title under 25 U.S.C. § 194. Since the Blackbird Bend land outside the Barrett Survey was not part of the original reservation established by the 1854 Treaty, defendants allege the Tribe cannot demonstrate the "previous possession or ownership" which triggers the statute. Therefore, the Tribe has the burden of proving its claim to Blackbird Bend land. Additionally, defendants assert that the Tribe's claim to land outside the original reservation arises out of state law, not federal.

**25.** Defendant's Reply Brief on Improvements, p. 12.

**26.** Neb. R.R.S. § 76–310. The occupant or claimant shall in no case be evicted from possession, or deprived of his right in the premises, except as provided in sections 76–308 and 76–309, and in case the successful claimant shall neglect to elect to take said real estate with improvements, or to convey the same to the occupant or claimant, within such time as the court shall direct, then decree shall be entered in favor of the occupant or claimant upon his payment in court the value of the real estate without improvements. Such decree shall have the effect to transfer and convey to such occupant or claimant the title and rights of the successful claimant.

Since the Tribe does not claim Blackbird Bend land as original tribal trust land, defendants conclude the Tribe's claim is barred by state laws of adverse possession, statutes of limitation and laches. Because the United States is not joined in the severed cases concerning title to land outside the Barrett Survey, the government's sovereign immunity cannot preclude the operation of the defenses of adverse possession, etc. Defendants finally argue the Tribe admitted that defendants and their predecessors occupied the Blackbird Bend lands for forty years. They conclude no genuine issue of material fact exists in dispute of defendants' claims by affirmative defenses.

In the Eighth Circuit, motions for summary judgment are considered "a harsh remedy . . . to be granted sparingly. . . ." *McLain v. Meier*, 612 F.2d 349, 355 (8th Cir. 1979). Rule 56 provides that summary judgment may be granted when the matters considered by the court disclose "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See*, Wright & Miller, *Federal Practice & Procedure, Civil* § 2725 (1973). The moving party has the burden of establishing the nonexistence of any genuine issue of fact, and all doubts are resolved against him. *Walling v. Fairmont Creamery Co.*, 139 F.2d 318, 322 (8th Cir. 1943). The Court of Appeals holds that a summary judgment should be granted only if the truth is clear, *Trayler v. Black, Sivalls & Bryson, Inc.*, 189 F.2d 213 (8th Cir. 1951); or unless the moving party demonstrates a right to a judgment with such clarity as to leave no room for controversy and he shows affirmatively that the opposing party cannot prevail under the circumstances, *Cervantes v. Time, Inc.*, 464 F.2d 986 (8th Cir. 1972); or unless the facts entitling the movant to summary judgment are admitted or are clearly established. The defendants failed to demonstrate the nonexistence of a genuine issue of material fact. One factual issue in dispute concerns the nature of river movements in Blackbird Bend nearly one hundred years ago. The river, by accretion or avulsion, could have created new tribal lands in Blackbird Bend which may not be acquired by adverse possession, statutes of limitation or laches. Another genuine issue of fact concerns the date of defendants' entry upon lands in Blackbird Bend and the sufficiency of the acts defendants allege constitute an adverse possession. Whether the Tribe ever acquiesced in defendants' possession of Blackbird Bend is an issue of fact. Moreover, with respect to lands within the Barrett Survey which belong to the Tribe, the jury may find the defendants committed a trespass. As long as "the slightest doubt remains as to the facts," there exists a genuine issue. *Armco Steel Corp. v. Realty Investment Co.*, 273 F.2d 483 (8th Cir. 1967).

In view of the complexity of the evidence and claims presented in this case through trial and appeals lasting seven years, this Court cannot conceive of an action less appropriately disposed of by summary judgment.

The foregoing constitutes this Court's Findings of Fact and Conclusions of Law.